H.G. GALLIMORE, INC., an Illinois corporation, et al., Plaintiffs,

v.

Fred ABDULA, et al., Defendants.

Everett R. LAUER, Plaintiff,

v.

Dean HUDDLESTON, et al., Defendants.

HIDDEN COVE MARINA, INC., a corporation, Plaintiff,

v.

VILLAGE OF FOX LAKE, a municipal corporation, et al., Defendants.

Nos. 85 C 7190, 85 C 8767 and 86 C 2742.

United States District Court, N.D. Illinois, E.D.

Jan. 22, 1987.

438

Paul J. Pettit, Phillip J. Zisook, Betar & Petit, P.C., Chicago, Ill., for plaintiffs H.G. Gallimore, Inc., Hal Gallimore, and Virginia Gallimore.

Frederick V. Lochbihler, Richard A. Wohlleber, David T.B. Audley, Chapman & Cutler, Chicago, Ill., for defendants Fred Abdula, Charles Ofenloch, George Harlow and Bank of Waukegan.

Jack F. Clifford, Jack F. Clifford & Associates, Ltd., Chicago, Ill., for plaintiff Everett R. Lauer.

L. Dean Huddleston, pro se.

Joan M. Eagle, Lawrence J. Weiner, Lawrence Jay Weiner & Associates, Chicago, Ill., for defendant Ronald Freund.

Jerome C. Brezinsky, Burton I. Weinstein, Baskin, Server, Berke & Weinstein, Chicago, Ill., for plaintiff Hidden Cove Marina, Inc.

Miriam L. Miquelon, Miquelon & Associates, Ltd., Chicago, Ill., for defendant Robert Schweiss.

### MEMORANDUM AND ORDER

MORAN, District Judge.

Three complaints alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* are now pending in this court. In *H.G. Gallimore, Inc. et al., v. Abdula,* No. 85 C 7190, the plaintiffs allege that the defendants engaged in mail fraud as part of a scheme to induce the individual plaintiffs to encumber personal assets to secure corporate debt. In *Lauer v. Huddleston, et al.,* No. 85 C 8767, the plaintiff alleges that the defendants engaged in mail and wire fraud to induce him to invest in certain oil leases and oil exploration projects in Kentucky. In *Hidden Cove Marina, Inc. v. Village of Fox Lake, et al.,* No. 86 C 2742, the plaintiff alleges that the defendants bribed public officials to secure an exclusive towing contract for the Village of Fox Lake and unincorporated areas of Lake County, Illinois, depriving the plaintiff of a source of business.

Motions to dismiss the RICO claims have been filed in *Lauer* and *Hidden Cove.* A motion for judgment on the pleadings has been filed in *Gallimore.* Because the cases present recurring issues involving the sufficiency of RICO allegations, the court will address all three cases together.

### I. GENERAL PLEADING REQUIREMENTS FOR CIVIL RICO CLAIMS

The civil RICO provisions are "constructed on the model of a treasure hunt." *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, 652 (7th Cir.1984); *see Haroco v. American Nat'l Bank & Trust Co. of Chicago,* 747 F.2d 384, 386–87 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" may recover treble damages from the violator. Section 1962 can be violated in four different ways. It is unlawful (a) "for any person who has received any income ... from a pattern of racketeering activity ... to use any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activ-

ities of which affect, interstate or foreign commerce"; (b) "for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or any control of any [such] enterprise"; (c) "for any person employed by or associated with any [such] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity"; or (d) "for any person to conspire to violate any of the provisions of" the previous subsections.

### A. Elements Essential to All RICO Claims

■ Certain elements are essential to state a claim under all four subsections of § 1962. These elements consist of (1) a person; (2) an enterprise; (3) racketeering activity which (4) occurred in a pattern, and (5) caused injury.

### 1. Person

■ A defendant in a civil RICO claim must be a "person" as that term is defined in § 1961(3):

"person" includes any individual or entity capable of holding a legal or beneficial interest in property....

The "person" need not be associated with organized crime. *See, e.g., Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 457 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Bennett v. Berg*, 685 F.2d 1053, 1063–64 (8th Cir. 1982), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).

Although the definition of "person" is very broad, the plaintiff should identify each "person" who is alleged to be liable under RICO. *See, e.g., Cashco Oil Co. v. Moses*, 605 F.Supp. 70, 71 (N.D.Ill.1985) ("Collectivizing 'defendants' in the alleged pattern of racketeering activity ... will not suffice."). This is important because an entity can be both a "person" and an "enterprise" under § 1961, but it may not be possible for it to fit both definitions for the same RICO claim. *See Masi v. Ford City Bank & Trust Co.*, 779 F.2d 397, 401–02

(7th Cir.1985) (entity can be both "person" and "enterprise" under § 1962(a)); *United States v. DiCaro*, 772 F.2d 1314, 1319–20 (7th Cir.1985) (individual cannot be both "person" and "enterprise" under § 1962(c)), *cert. denied*, — U.S. —, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986); *Haroco*, 747 F.2d at 400 (corporation cannot be both "person" and "enterprise" under § 1962(c)); *Bruss Co. v. Allnet Communications Services, Inc.*, 606 F.Supp. 401, 407 (N.D.Ill.1985) (entity cannot be both the liable person and the enterprise under § 1962(b)).

### 2. Enterprise

Allegations of an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce" are also essential to state a civil RICO claim. The term " 'enterprise' includes any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), the Supreme Court explained that

[t]he enterprise is an entity, for present purposes a group of persons associated for a common purpose of engaging in a course of conduct.... [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.... The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the activity in which it engages.

As the Eighth Circuit summarized, a RICO "enterprise" must exhibit three basic characteristics: (1) common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering. *United States v. Lemm*, 680 F.2d 1193, 1198–1201 (8th Cir. 1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *see United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir.1986) ("the term 'enterprise' en-

compasses legitimate entities and *de facto* illegal enterprises...."), *cert. denied,* —— U.S. ——, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *McCullough v. Suter,* 757 F.2d 142 (7th Cir.1985) (sole proprietorship can be an "enterprise" with which its proprietor can be "associated"); *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1285 (7th Cir.1983) (an enterprise includes the entities listed in § 1961(4) or any combination of them); *Otto v. Variable Annuity Life Ins. Co.,* 611 F.Supp. 83, 89 (N.D.Ill.1985) (conclusory use of the term "enterprise" is insufficient).

■ The plaintiff must also allege some nexus between the enterprise and interstate commerce. *Bunker Ramo,* 713 F.2d at 1289. This requirement is met if an enterprise affects interstate commerce through its activities, even if it is the racketeering activities of the enterprise that affect interstate commerce. *Id.; United States v. Conn,* 769 F.2d 420, 423–24 (7th Cir.1985). The criteria for establishing this nexus are minimal. *See United States v. Murphy,* 768 F.2d 1518, 1531 (7th Cir.1985) (Circuit Court of Cook County was an enterprise that "affected commerce—in what it bought, in its effect on the lawyers and litigants who appeared before it."), *cert. denied,* —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986); *Bunker Ramo,* 713 F.2d at 1289.

### 3. Racketeering Activity

■ All four subsections of § 1962 require allegations of "racketeering activity" to state a claim. Section 1961(1) sets forth a long list of offenses ("predicate offenses") that constitute "racketeering activity." To state a civil RICO claim the plaintiff must allege that the defendants committed offenses that are on the list, and each of those offenses have their own pleading requirements. As the Seventh Circuit held in *Ray v. Karris,* 780 F.2d 636 (7th Cir.1985):

> A complaint is not sufficient if it does not specify the nature of the predicate acts to a degree that will allow the defendants to comprehend the specific acts to

which they are required to answer.... The allegations of the criminal activity must ... comply with notice pleading requirements; pure assertions of a statutory violation standing alone are not sufficient.

780 F.2d at 645 (dismissing a RICO claim where mail and wire fraud allegations were insufficient and securities allegations under Rule 10b–5 failed to state a claim); *Harris Trust & Savings Bank v. Ellis,* 609 F.Supp. 1118, 1122 & n. 8 (N.D.Ill.1985) (complaint that failed to allege interstate wire transmissions did not establish wire fraud as a predicate offense).

■ In addition, Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud specify "with particularity" the circumstances of the alleged fraud, applies to fraud allegations in a civil RICO complaint. *Haroco,* 747 F.2d at 405. To satisfy Rule 9(b), the plaintiff must describe the time, place, particular contents of the false representations, the identity of the party making the misrepresentation, and the consequences of the misrepresentation. *See, e.g., UNR Industries, Inc. v. Continental Ins. Co.,* 623 F.Supp. 1319, 1328–29 (N.D.Ill.1985); *McKee v. Pope, Ballard, Shepard & Fowle, Ltd.,* 604 F.Supp. 927, 930 (N.D.Ill.1985). Where there are multiple defendants, the complaint must inform each defendant of the specific fraudulent acts justifying his inclusion in the count. *UNR Industries,* at 1329; *see McKee,* at 931. However, Rule 9(b) only requires that the complaint generally outline a fraudulent scheme and reasonably notify each of the defendants of their respective roles. *See Haroco,* 747 F.2d at 405. *See generally Morgan v. Kobrin Securities, Inc.,* 649 F.Supp. 1023 (N.D.Ill.1986) (upholding a complaint under Rule 9(b)).

### 4. Pattern

■ To satisfy the "pattern" requirement, the plaintiff must allege at least two predicate offenses "one of which occurred after the effective date of this chapter [October 15, 1970], and the last of which oc-

curred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). While two predicate offenses are necessary to constitute a "pattern," they may not be sufficient. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). In *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986), the Seventh Circuit formulated a factually-oriented standard for the pattern requirement:

> ... to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, *i.e.,* "transactions 'somewhat separated in time and place.'" [citations omitted] Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries. However, the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement.

*See Lipin Enterprises Inc. v. Lee,* 803 F.2d 322, 324 (7th Cir.1986) ("pattern" means acts "committed in a manner characterizing the defendant as a person who regularly commits such crimes"); *see also Papai v. Cremosnik,* 635 F.Supp. 1402, 1413 (N.D. Ill.1986) ("multiple episodes evincing a regular, ongoing course of conduct" must be alleged to meet the pattern requirement).

**5. Injury**

■ The plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. 18 U.S.C. § 1964(c); *Sedima,* 473 U.S. at 495–98, 105 S.Ct. at 3285–86. In *Sedima,* the Supreme Court held that this requirement was satisfied by allegations of injury from the defendant's predicate offenses— no additional "racketeering injury" was required:

Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.... Any recoverable damages occurring by reason of a violation ... will flow from the commission of the predicate acts.

*Id.* (footnote omitted), (*citing Haroco,* 747 F.2d at 398); *see also Carter v. Berger,* 777 F.2d 1173 (7th Cir.1985) (taxpayer plaintiffs could not sue defendants under RICO for indirect injury from tax fraud).

**B. Substantive Violations of Section 1962**

In addition to adequately pleading an "injury" resulting from a "pattern of racketeering activity" by a "person" involving an appropriate "enterprise," the plaintiff must allege conduct by the defendant that violates one or more of the four subsections of § 1962. *See Sedima,* 105 S.Ct. at 3285 ("Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is mere commission of the predicate offenses.") Although there is some overlap, each subsection proscribes different conduct. In analyzing the allegations in *Sutliff, Inc. v. Donovan Companies, Inc.,* the Seventh Circuit illustrated some of the differences between the four subsections of § 1962:

> The complaint alleges that the defendants used the income from their "racketeering activity" (that is, from the alleged mail and wire fraud) in the operation of Sutliff—concretely, that they used the money they made by reselling the oil which they were fraudulently purchasing from Sutliff to make the cash advances to Sutliff that kept the fraud going. This is a good allegation under section 1962(a). The complaint also alleges that the defendants acquired control of Sutliff by means of the fraud. As control within the meaning of the statute need not be formal—need not be the kind

of control that is obtained, for example, by acquiring a majority of the stock of a corporation [citation omitted], this is a good allegation under section 1962(b). The complaint also describes the defendants as having "associated with" Sutliff and conducted its affairs by means of the fraud; and if, as these allegations imply, the defendants infiltrated Sutliff and used it as a tool to defraud it and the other defendants, section 1962(c) was violated. Finally, the allegation that the defendants conspired to violate the previous subsections is a good allegation of a violation of section 1962(d).

727 F.2d 653–54. *See Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285 ("a violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."); *United States v. Neapolitan,* 791 F.2d at 494–500 (violation of a § 1962(d) requires an agreement to the commission of at least two predicate acts and the involvement of a RICO enterprise); *Ray v. Karris,* 780 F.2d at 644; *SJ Advanced Technology & Mfg. Corp. v. Junkunc,* 627 F.Supp. 572, 575 (N.D.Ill.1986) (violation of § 1962(a) requires allegations of "(1) the relationship between the individual defendants as the RICO persons and ... their enterprise, (2) the individuals having derived income from the racketeering activity, and (3) the use of that income in the enterprise's operation.").

Because claims under each of the four subsections of § 1962 have different elements, the plaintiff should identify the subsection(s) on which his RICO claim is based rather than force the courts and the defendant to decide. *See Papai v. Cremosnik,* 635 F.Supp. at 1405–06; *Lewis v. Sporck,* 612 F.Supp. 1316, 1325 (N.D.Cal. 1985). Moreover, merely specifying a subsection of § 1962 normally is not enough. The plaintiff must allege at least some factual basis for the necessary components of his claim. *See Junkunc,* 627 F.Supp. at 575 ("a defendant is entitled to rely on more than guesswork (even educated guesswork) on [the] necessary components of a claim [under § 1962(a) ]").

## II.

Each of the complaints described below are flawed in one or more respects. In *H.G. Gallimore, Inc. v. Abdula,* the complaint fails chiefly because it fails to plead any predicate offenses, although it has other problems as well. In *Lauer v. Huddleston,* allegations of the RICO enterprise and of certain predicate offenses are defective, but the complaint relates enough facts to state a claim under § 1962(c). In *Hidden Cove Marina, Inc. v. Village of Fox Lake,* the complaint fails to relate enough facts to allege that the predicate offenses described constituted a pattern.

### A. H.G. Gallimore, Inc. v. Abdula

Plaintiffs H.G. Gallimore, Inc. ("Gallimore, Inc."), Hal Gallimore and Virginia Gallimore brought this action on August 14, 1985, after defendant Bank of Waukegan ("the Bank") discontinued its practice of honoring checks drawn by Gallimore, Inc. on insufficient funds ("overdraft checks"). Count V of the complaint alleges that this action breached a de facto line of credit agreement between the Bank and Gallimore. Count IV alleges that this breach of contract was willful. Count III alleges that the defendants committed common law fraud. Subject matter jurisdiction over these state law claims depends on counts I and II, which allege that the defendants violated § 1962(c) and (d) of RICO, respectively.

On August 20, 1985, the plaintiffs filed a motion for preliminary injunction seeking to prevent the Bank from foreclosing on certain residential property held by Mr. and Mrs. Gallimore. Since then, the case has been before this court on several motions by the plaintiffs for interim equitable relief to forestall other collection efforts by the Bank. The preliminary injunction motion was referred to a magistrate, who issued a 20–page report making proposed findings of fact and recommending that the motion be granted. This court accepted the magistrate's findings and granted plaintiffs' motion.

Defendants now move for judgment on the pleadings under Fed.R.Civ.P. 12(c) as to plaintiffs' RICO claims. Because the plaintiffs' state law claims are before the court solely on the basis of pendent jurisdictions, defendants also move to dismiss those claims for lack of subject matter jurisdiction. For the following reasons, defendants' motion for judgment on the pleadings as to the RICO claims is granted. Their motion to dismiss the pendent state law claims for lack of subject matter jurisdiction is also granted.

### 1. Facts [1]

Gallimore, Inc. is an Illinois corporation with its principal place of business in Northbrook, Illinois. Hal Gallimore is the president of Gallimore, Inc. and Virginia Gallimore is his wife. In addition to the Bank, the complaint also names the chairman of the Bank's board of directors, Fred Abdula, the Bank's president, Charles Ofenloch, and one of the Bank's senior vice-presidents, George Harlow, as defendants (collectively, "the individual defendants").

Since 1982, Gallimore, Inc. has been in business as a plumbing and fire protection contractor specializing in commercial construction and remodeling. The complaint states that Gallimore, Inc. and Mr. and Mrs. Gallimore did all of their banking business at the Bank. From time to time, the Bank made loans to the plaintiffs, taking as security a mortgage in the Gallimore's personal residence and an assignment of Gallimore, Inc.'s accounts receivable and equipment. Beginning in December 1983 and continuing for the next 19 consecutive months, the Bank extended credit to Gallimore, Inc. by honoring its overdraft checks. These overdraft obligations were periodically retired, in whole or in substantial part, by depositing receipts from Gallimore, Inc.'s plumbing work in its account at the Bank.

During that 19–month period the Bank honored hundreds of overdraft checks, cre-

ating a negative balance of up to $310,000 or more. The Bank mailed at least 300 overdraft notices in addition to regular monthly banking statements. The Bank collected service charges on each overdraft check it honored. According to the complaint, these charges exceeded $18,000, more than the interest charged by the Bank on loans of similar amounts. Mr. Gallimore requested that the Bank establish a formal line of credit for Gallimore, Inc. on several occasions, but the requests were denied.

The plaintiffs allege that this course of dealing resulted in the creation of a *de facto* line of credit agreement between the Bank and Gallimore, Inc. Plaintiffs claim that this agreement could only be terminated by commercially reasonable advance notice to Gallimore, Inc. Plaintiffs also claim that the individual defendants, acting on behalf of the Bank, repeatedly assured the plaintiffs that it would continue to finance Gallimore, Inc.'s pending construction contracts by honoring overdraft checks, to be paid by collection of Gallimore, Inc.'s accounts receivable.

According to the complaint, the defendants induced Mr. and Mrs. Gallimore to convey their personal interests in certain real estate by continuing to make these assurances even after they knew that the Bank had no intention of continuing to honor Gallimore, Inc.'s overdraft checks. In May 1985 the Gallimores agreed to grant the Bank a mortgage on their residence in Door County, Wisconsin. On June 13, 1985, Mr. Gallimore met with the individual defendants at the Bank. At that meeting Gallimore, Inc.'s corporate finances and the Gallimore's personal finances were discussed. It was agreed that the Bank would continue to finance to completion Gallimore, Inc.'s outstanding contracts and that Gallimore, Inc. would attempt to secure notes guaranteed by its contractor-employers for its accounts receivable and to improve its collections. Mr.

---

1. Since this is a motion for judgment on the pleadings, the facts here are drawn only from plaintiffs' complaint rather than from the record developed by the parties before the magistrate.

Gallimore also would personally supervise the completion of the Gallimores' personal residence in Lake Forest, Illinois, using funds advanced by the Bank and occupying the residence until it could be sold. Mr. Gallimore agreed to convey the Lake Forest residence to the Bank. Defendant Harlow, acting on behalf of the Bank, issued a letter on June 21, 1985, setting forth the general terms of the June 13 agreement.

Two days after the Gallimores conveyed their Lake Forest residence to the Bank, the defendants decided to stop honoring Gallimore, Inc.'s overdraft checks, effective July 1, 1985. Gallimore, Inc.'s account was then overdrawn by $75,000. The Bank began dishonoring Gallimore, Inc.'s checks without notice. Mr. Gallimore was informed of the Bank's decision when he called the Bank on the afternoon of July 1. Without financing, Gallimore, Inc. had to shut down all operations, lay off all employees and permanently cease performance of its various construction contracts, thus breaching its contractual obligations to general contractors, suppliers, owners and employees.

## 2. Discussion

For the purposes of this motion, the court assumes, without deciding, that the complaint states breach of contract and common law fraud claims in counts III, IV and V. However, accepting plaintiffs' allegations as true, and making all inferences in their favor,[2] the complaint does not state a claim under RICO.

■ The RICO "persons" are the three individual defendants and the Bank. Plaintiffs advance two theories of what constitutes the RICO "enterprise." One theory is that the enterprise consists of an association-in-fact of the Bank and the individual defendants. However, no factual allegations support this theory. For example,

there are no allegations concerning the formation, purpose, history or other activities of the alleged association. The only allegations of the association's structure merely establish that each of the individual defendants was employed by the Bank. At most, the complaint permits the inference that the defendants associated for the common purpose of defrauding the plaintiffs. But as the Seventh Circuit explained:

> ... the central element of an enterprise is structure. An enterprise must be more than a group of people who get together to commit a "pattern of racketeering activity."

*United States v. Neapolitan*, 791 F.2d at 500. Thus plaintiffs' association-in-fact theory fails.

■ Plaintiffs' second theory is that the Bank alone is the RICO enterprise. Pleading that an otherwise legitimate business is a RICO enterprise is normally much simpler than pleading the existence of some nebulous association in fact. The allegation that the Bank is a state-chartered banking association that does substantial banking business and engages in interstate banking transactions sufficiently supports the theory that the Bank is an enterprise.

But the Bank, as a RICO person, cannot be liable under § 1962(c) for conducting its own affairs. *Haroco*, 747 F.2d at 402. *A fortiori*, the complaint does not state a claim against the Bank for conspiring to violate § 1962(c).[3] The Bank is entitled to judgment on the pleadings as to counts I and II on this basis alone.[4]

■ The individual defendants might be liable for conducting the affairs of the Bank through a pattern of racketeering activity. However, the complaint does not sufficiently plead any predicate offenses. Plaintiffs' theory is that the overdraft notices and banking statements mailed by the

2. A motion for judgment on the pleadings is subject to the same standards as a motion to dismiss. *See, e.g., Susman v. Lincoln American Corp.*, 517 F.Supp. 931, 934 & n. 7 (N.D.Ill.1981).

3. The conspiracy allegations have other problems also. *See* note 5 *infra*.

4. Plaintiffs do not argue that the Bank is liable under § 1962(a). While leave to amend might have been appropriate to enable the plaintiff to try to state a claim under that section, the complaint here also is fatally deficient in other respects.

Bank constituted mail fraud, but the mailings described do not violate the federal mail fraud statute.

The mail fraud statute, 18 U.S.C. § 1341, consists of two essential elements: (1) a scheme to defraud; and (2) the use of the mails in furtherance of that scheme. *See, e.g., United States v. Brooks,* 748 F.2d 1199, 1202 (7th Cir.1984). Plaintiffs articulate the alleged scheme to defraud as

> consisting of the extension of credit to H.G. Gallimore by the questionable, if not wholly improper, banking practice of honoring overdrafts, and securing the repayment of those overdraft charges by extracting personal collateral from the Gallimores in return for a knowingly false promise to continue financing H.G. Gallimore, Inc. Once the purpose of the scheme had been accomplished, funneling the Gallimores' personal assets into the corporation to secure corporate debt, the defendants reneged on the promise to continue financing, putting H.G. Gallimore, Inc. out of business and plunging the Gallimores and the corporation into insolvency.

That characterization of the complaint is accurate enough for the purposes of this motion. The court assumes, without deciding, that the complaint sufficiently alleges a scheme to defraud. *See, e.g., Evanston Bank v. ContiCommodity Services, Inc.,* 623 F.Supp. 1014, 1028–29 (N.D.Ill.1985) ("When a promise or representation relating to future conduct is alleged to be the scheme employed to accomplish the fraud, it is actionable"). The complaint plainly alleges use of the mails, and as mail fraud cases involving check-kiting schemes show, even mailing routine, purely informational and completely accurate banking documents can result in a mail fraud violation. *See, e.g., United States v. Freitag,* 768 F.2d 240 (8th Cir.1985); *United States v. Britzman,* 547 F.2d 380 (7th Cir.1977).

But the mail fraud statute requires that the mailing be "for the purpose of executing" the scheme, not just that the mails be used as a result of the fraudulent scheme. *See United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In a mail fraud case involving check-kiting, for example, the defendants' purpose is an issue of fact that depends on how the bank statements and overdraft notices were used. For example, in *Freitag,* the defendant's mail fraud conviction was affirmed where the record shows that the banking statements were used to monitor an elaborate check-kiting scheme involving seven bank accounts. In *Britzman,* the defendants' convictions were reversed because the record actually contradicted any inference that the defendants ever made use of the banking statements and overdraft notices they received to manage a short-lived check-kiting scheme involving two bank accounts.

The problem with plaintiffs' complaint here is that, even making all inferences in the plaintiffs' favor, the Bank's mailing of monthly statements and overdraft notices did not further the defendants' alleged scheme. The scheme did not consist of misrepresenting Gallimore, Inc.'s account balance, nor did it consist of collecting excessive overdraft charges, or of misrepresenting that overdraft checks were being honored when in fact they were not. Instead, plaintiffs allege that the defendants extracted personal collateral from the Gallimores by falsely representing that the Bank would continue to honor Gallimore, Inc.'s overdraft checks. How routine, accurate banking statements and overdraft notices could possibly aid the defendants in carrying out any aspect of this scheme is difficult to imagine. Indeed, if anything, the banking statements and overdraft notices would probably make it more likely that the alleged scheme would be discovered because they would show whether or not the Bank was continuing to honor checks drawn on insufficient funds. *See, e.g., Spiegel v. Continental Illinois National Bank,* 790 F.2d 638, 649 (7th Cir.) (mailings that made it more likely that the alleged scheme would be uncovered could not constitute mail fraud because they were not in furtherance of the scheme), *cert. denied,* —— U.S. ——, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *United States v.*

*Staszcuk,* 502 F.2d 875, 881 (7th Cir.1974) (rejecting as irrelevant the government's argument that but for the fraudulent scheme there would have been no mailings), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *Evanston Bank v. ContiCommodity Services, Inc.,* 623 F.Supp. at 1025 (mailing regular and accurate reports to the victim cannot further a scheme to defraud).

Because plaintiffs' mail fraud allegations are deficient, the complaint alleges no "racketeering activity" under § 1961(1). Therefore, there can be no "pattern of racketeering activity" (we do not, therefore, address the weakness of the pattern allegations, which necessarily must relate to the encumberance of assets followed by the termination of credit), nor any injury by reason of a violation of § 1962. Furthermore, the RICO conspiracy allegations of the count II fail because whatever it is that defendants may have conspired to do they did not conspire to violate § 1962(c).[5] Accordingly, defendants' motion for judgment on the pleadings as to counts I and II of plaintiffs' complaint must be granted. As that leaves counts II, IV and V without an independent basis for federal jurisdiction, defendants' motion to dismiss counts II, IV and V is also granted. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### B. Lauer v. Huddleston

#### 1. Facts

Plaintiff Everett Lauer, an Illinois resident, sued defendants Banner Exploration Company ("Banner"), L. Dean Huddleston and Ronald Freund to recover money he invested in allegedly fictitious oil explora-tion projects conducted by Banner. The amended complaint[6] states that Banner was a corporation "allegedly engaged in the business of exploring for oil, drilling for oil, and selling leases and fractions of leases to the general public" (complaint, ¶ 5). Defendant Huddleston is a Kentucky resident who was an officer and employee of Banner. Defendant Freund is an Illinois resident who was a sales representative and agent for Banner. In the latter half of 1984 Banner moved its principal place of business from Illinois to Kentucky.

The complaint consists of a single RICO count. According to Lauer, Freund and Huddleston induced him to invest $2,250 in an oil well in Warren County, Kentucky ("the Watkins well") by making intentional misrepresentations over the telephone. Lauer alleges that on October 22, 1983, he was told that "oil was 'very likely['] to be discovered in the Watkins Oil Lease, Warren County, Kentucky; and that the Banner Exploration Company was starting to drill for oil in the Watkins well ..." (complaint, ¶ 9). On October 31, 1983, he was told that the prospects of finding oil in the Watkins well looked "even better" (*Id.*). Lauer invested another $2,500 in the Watkins well after he was falsely told on December 15, 1983, that the Watkins well was actually pumping oil (complaint, ¶ 10).

Lauer also invested $2,250 in the Miller well, another Banner oil project. The complaint states that Freund contacted Lauer by telephone on or about November 9, 1983, and intentionally misrepresented that "there was a 90% certainty that oil was likely to be discovered on the Miller Oil Lease and that Banner was drilling for oil in the Miller [well]" (complaint, ¶ 11). Freund also intentionally misrepresented

---

**5.** The complaint also alleges a conspiracy between the Bank and its directors and officers, each of whom are alleged to have been acting on behalf of the Bank throughout. Because the actions of agents within the scope of their corporate authority are the acts of a single corporate entity rather than of separate persons, no conspiracy exists on the facts alleged here. *See, e.g., Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir.1972); *Elbe v. Wausau Hospital Center,* 606 F.Supp. 1491, 1501–02 (W.D.Wis.1985); *Bonnano v. LaSalle & Bureau County R.R. Co.,* 87 Ill.App.3d 988, 995, 42 Ill.Dec. 866, 891, 409 N.E.2d 481, 486 (3d Dist.1980); *see also U.S. v. Neapolitan,* 791 F.2d at 497 (traditional conspiracy law applies to § 1962(d)).

**6.** Lauer's first complaint was dismissed on July 9, 1986, because it did not plead the alleged misrepresentations with particularity, Fed.R. Civ.P. 9(b), and it did not sufficiently plead the existence of an "enterprise," 18 U.S.C. § 1961(4).

that oil would be pumped from the Miller well for at least 20 years. On December 16, 1983, Freund again contacted Lauer to solicit $2,000 to cover "completion costs" for the Miller well, falsely stating that oil had been found there and that Lauer would be receiving money for his investment (complaint, ¶ 12). Lauer mailed the money to Freund based on these misrepresentations.

On February 8, 1984, Lauer was told that the Miller well was dry but that Banner would reimburse him for "most of the completion costs" (complaint, ¶ 13). The complaint states that this was an intentional misrepresentation, but it does not identify who made it.

Based on "further misrepresentations of the defendants," Lauer invested another $2500 to obtain a ¹⁄₃₂ interest in a third oil well, located in Logan County, Kentucky ("The Bond well") (complaint, ¶ 14). One month later, Freund allegedly told Lauer in a telephone conversation that the Bond well was dry, but that Banner would reimburse him with an interest in another well.

On May 2, 1984, Lauer was given a ¹⁄₃₂ interest in yet another Banner oil project ("the Sandidga well") to reimburse him for his investment in the Bond well. "The defendant" asked Lauer for $2,000 to complete the Sandidga well, intentionally misrepresenting that the $2,000 would be returned if the well was dry (complaint, ¶ 15). When this well went dry, Lauer received a check for $2,000 (apparently from defendant Banner), but it bounced. A second check for $2,000 was returned because Banner's account apparently had been closed.

On July 3, 1986, a default judgment was entered against defendant Huddleston. On September 8, 1986, a default judgment was entered against defendant Banner. The only remaining defendant is Mr. Freund.

### 2. Discussion

■ Lauer's complaint is flawed in many respects, but the court concludes that the defects are not so serious as to require dismissal. The complaint never identifies who the RICO "persons" are, but because the complaint consists of a single count naming three defendants, the court will infer for the purposes of this motion that each defendant is a "person."[7] Lauer's "enterprise" allegation that defendants Freund, Huddleston and Banner "were participants in an enterprise to obtain monies and investments by making untrue statements and by selling interests in certain oil leases and exploration projects" (complaint, ¶ 8), come perilously close to stating that the enterprise consists of nothing more than the "pattern of racketeering activity" in which it allegedly engaged. *See Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. However, the allegations are also consistent with the existence of an enterprise consisting of Banner alone, rather than consisting of an association-in-fact among all the defendants. Huddleston and Freund were employed by or associated with Banner as its president and sales representative, respectively. Making all inferences in favor of the plaintiff, the complaint sufficiently alleges the existence of an enterprise, but just barely.[8] The complaint also alleges a sufficient "injury" to make out a *prima facie* case under RICO.[9]

---

7. Numerous references in the complaint to conduct by "the defendants" (*e.g.,* complaint, ¶¶ 9, 10, 12–16) suggest that the liable entity is an "association in fact" among the defendants. However, in *Haroco,* the Seventh Circuit casts serious doubt on whether an "association in fact" can ever be a liable "person" under RICO. 747 F.2d at 401. Moreover, Freund is the only remaining defendant.

8. The complaint sufficiently alleges the required nexus between the enterprise and interstate commerce because the defendants are alleged to

have solicited an Illinois resident to buy oil wells in Kentucky.

9. Freund's argument that the complaint must be dismissed because the investment losses complained of do not add up to the $20,000 Lauer seeks in damages is frivolous. The issue has no jurisdictional consequences, and the amount of plaintiff's damages is a question of fact that cannot be decided on a motion to dismiss.

Lauer's allegations of "racketeering activity" warrant more detailed discussion. First, the complaint does not sufficiently allege a single instance of wire fraud as a predicate offense. Under 18 U.S.C. § 1343, only interstate communications can constitute wire fraud. Lauer does not allege that any interstate telephone calls were made, and according to the complaint the fraudulent calls were made when all the parties resided in Illinois.

■■■ Lauer argues that the RICO statute only requires that the activity of the enterprise, not each predicate act of racketeering, have some effect on interstate commerce. While that statement is correct, it completely misses the point—using the telephone to commit fraud is not "racketeering activity" under § 1961(1) unless it violates the federal wire fraud statute, 18 U.S.C. § 1343, and an interstate communication is an essential element of such a violation. *Harris Trust & Savings Bank v. Ellis*, 609 F.Supp. at 1122 & n. 8. The telephone calls described in paragraphs 9–11 and 13–14 are not predicate offenses because they took place entirely within the State of Illinois.

That leaves the mail fraud allegations. Lauer adequately alleges a scheme to defraud consisting of affirmative misrepresentations by defendants Freund and Huddleston on behalf of Banner to induce him to invest in fictitious oil wells. According to the complaint, the mails were used in furtherance of the scheme on three occasions. On December 15, 1983, Lauer mailed Banner $2500 to be invested in the Watkins well (complaint, ¶ 10). On December 16, 1983, he mailed $2,000 to "the defendants" to be invested in the Miller well (complaint, ¶ 12). On or about May 2, 1984, he mailed $2,000, apparently to one of the defendants, to be invested in the Sandidga well (complaint, ¶ 15). Each of these mailings violated the mail fraud statute. *See, e.g., United States v. Murphy*, 768 F.2d 1518, 1530 (7th Cir.1985) ("It is enough if

use of the mails is an ordinary or expectable event in the course of the scheme and the mailings further the scheme."), *cert. denied*, —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

Freund argues that Lauer's fraud allegations are still deficient under Rule 9(b). The court disagrees, although the issue is a close one. Freund is clearly identified as the party making misrepresentations on November 9, 1983 and December 16, 1983. Freund is identified as one of the parties making misrepresentations on October 22, 1983 and December 29, 1983. The complaint describes the contents of the misrepresentations that were made on those occasions. Several paragraphs of Lauer's complaint are deficient under Rule 9(b) because they refer only to "the defendant" or "the defendants" collectively, instead of identifying which of the parties engaged in the alleged fraudulent conduct (*e.g.*, complaint ¶¶ 10, 13, 15),[10] but taken as a whole the complaint adequately informs Freund of his role in the defendants' alleged scheme.

Freund next argues that the complaint does not allege a "pattern" of racketeering activity. The complaint alleges seven instances of fraud, and as the court stated in its earlier opinion in this case, those seven instances are sufficient to constitute a "pattern." The problem is that common law fraud is not defined as "racketeering activity," and Lauer's wire fraud allegations are insufficient as a matter of law. The question now is whether the three remaining predicate offenses of mail fraud constitute a "pattern." The alleged mail frauds took place on December 15, 1983, December 16, 1983 and May 2, 1984. They were part of a regular, ongoing course of conduct—soliciting investments in oil wells—that took place over an identified period of time. Each mailing was alleged to be in response to a separate misrepresentation involving a different oil well, so the injuries they caused were distinct. Although each predicate offense involved the

**10.** Lauer must amend his complaint if he intends to offer evidence on the allegations that

are not pleaded with particularity.

same victim, several distinct transactions are alleged. The complaint here is more like the one upheld by the Seventh Circuit in *Morgan,* which alleged several instances of mail fraud in connection with two mortgage foreclosures, than it is to the complaint dismissed in *Lipin,* which alleged several instances of mail fraud in connection with an attempt to defraud one victim in one transaction. The complaint alleges an ongoing course of conduct involving multiple episodes of mail fraud. *See Papai v. Cremosnik,* 635 F.Supp. at 1413. Therefore the court holds that the RICO pattern requirement is satisfied.

■ Finally, Freund argues that the complaint should be dismissed because Lauer does not specify which subsection of § 1962 he is suing under. While the court would strongly prefer a RICO plaintiff to specify which subsection of § 1962 was allegedly violated, failure to do so does not automatically constitute grounds for dismissal under Fed.R.Civ.P. 12(b)(6). Lauer's complaint does not state a claim under § 1962(d) because it does not allege any agreement among the defendants to violate RICO. The complaint does not state a claim against Freund under § 1962(b) because it does not allege that he acquired or maintained any interest or control of the alleged enterprise. The complaint does not state a claim under § 1962(a) because there are no allegations at all about how Freund, or any of the defendants, used the money derived from their alleged racketeering activity.

However, according to the complaint Freund allegedly conducted the affairs of an enterprise with which he was associated by soliciting investments through committing at least three acts of mail fraud. Accepting Lauer's allegations as true, the complaint does state a claim against Freund under § 1962(c). Accordingly, Freund's motion to dismiss is denied.

11. The other alleged co-conspirators are Sheriff Robert Babcox, Mayor Richard Hamm, Arthur Newell, Police Chief Robert Trinski, Sr., and Police Lieutenant Ronald Nagel. Except for

## C. Hidden Cove Marina, Inc. v. Village of Fox Lake

Plaintiff Hidden Cove Marina ("Hidden Cove") runs a 24–hour towing service in Lake County, Illinois, that depended for much of its business on referrals from law enforcement personnel. Hidden Cove first appeared in this court in July 1982 (No. 82 C 4470) after it was informed that it would no longer get referrals from the Fox Lake village policy and the Lake County sheriff's department. Hidden Cove's first complaint did not state a claim and it was dismissed with leave to amend. The amended complaint was dismissed with prejudice when Hidden Cove failed to respond to motions to dismiss filed by the defendants named in that complaint. Hidden Cove's motion to vacate that dismissal was denied.

Hidden Cove commenced the instant action when it reappeared in April 1986 with a new one-count RICO complaint that named additional defendants. This court dismissed that complaint on *res judicata* grounds as to those defendants who had been named in the earlier action. Of those that remain, defendant Robert Schweiss now moves to dismiss the complaint for failure to state a claim.

### 1. Facts

According to the complaint now before the court, Robert Schweiss was president, director and shareholder of A–1 Auto, Route 12, Inc. ("A–1 Auto"), one of Hidden Cove's competitors, at all times relevant to the complaint. His brother, Thomas Schweiss, also participated in the management and control of A–1 Auto. Hidden Cove alleges that Lake County and Fox Lake stopped referring towing business to it as a result of a conspiracy among Robert Schweiss, Thomas Schweiss and several other individuals, including several public officials.[11] In particular, Robert and Thomas Schweiss allegedly violated RICO § 1962(c) and (d) by "conspiring with Ar-

Arthur Newell, the complaint has been dismissed as to these defendants on *res judicata* grounds.

thur Newell in the repeated acts of extortion and bribery as defined in chapter 38 Illinois Revised Statutes ..." (complaint, ¶ 24). The complaint states that Robert Schweiss paid a series of $100 bribes through Arthur Newell to Richard Hamm, then mayor of Fox Lake, to obtain an exclusive contract for all of Fox Lake's towing business. The complaint provides no details concerning Lake County's towing business.

The complaint refers to federal criminal charges that were brought against Newell and Hamm, but the indictments are not attached to the complaint, nor have the parties otherwise provided the court with copies. In *United States v. Newell*, No. 85 CR 374, Newell pleaded guilty to charges of racketeering and extortion based in part on his role in taking money from Robert Schweiss and passing it to Hamm to maintain A-1 Auto's exclusive towing contract with Fox Lake. In *United States v. Hamm, et al.*, No. 85 CR 284, Hamm pleaded guilty, based in part on his role in accepting the money.

## 2. Discussion

■■ As the brevity of the court's statement of facts suggests, the complaint contains few pertinent factual allegations. Paragraphs 6 and 7 of Hidden Cove's complaint do state that Robert Schweiss is a RICO "person" and that A-1 Auto is a RICO "enterprise." Robert Schweiss' suggestion that all of the defendants in a RICO action must be connected to a single enterprise is incorrect, as is Hidden Cove's suggestion that conspiracy allegations, without more, satisfy RICO's enterprise requirement. Despite Robert Schweiss' attempts to mischaracterize the complaint and Hidden Cove's effort to argue in its memorandum an association-in-fact theory that is unsupported by its allegations, the person and enterprise requirements of Hidden Cove's RICO claim are satisfied. The complaint also fairly alleges that Hidden Cove lost an identifiable source of business as a result of conduct by Robert Schweiss and the other defendants, which would certainly be an injury cognizable under RICO.

Because the alleged predicate offenses are "repeated acts of extortion and bribery" and not some kind of fraud, Fed.R. Civ.P. 9(b) does not apply. Hidden Cove's charges of extortion against Schweiss are deficient even by Rule 8 standards because no factual allegations support them. But the transactions described in paragraph 29 of Hidden Cove's complaint do comply with Rule 8 and they appear to constitute bribery under Ill.Rev.Stat. ch. 38, ¶ 33-1(c). Violations of that statute constitute "racketeering activity" under § 1961(1). *See United States v. Kaye*, 586 F.Supp. 1395, 1398-99 (N.D.Ill.1984).

Nevertheless, the complaint does not state a claim because Hidden Cove has failed to plead enough facts about these transactions to allege a "pattern." Hidden Cove does not allege any period of time over which bribes occurred, nor is there even a general indication of how many bribes were paid. Only one type of predicate offense relating to one contract is alleged. No details of any separate schemes, other victims, or distinct injuries are provided. A catchall general reference to charges in indictments does not help plaintiff here.[12] All Hidden Cove has done is plead that predicate offenses occurred repeatedly, and under *Morgan* that is not enough to allege a pattern.

The court agrees with Schweiss that Hidden Cove's complaint is haphazardly drawn. However, Hidden Cove may well be able to state a claim under § 1962(c) and

---

**12.** Fed.R.Civ.P. 10(c) permits allegations to be incorporated by reference, but Hidden Cove has not physically attached copies of the indictments to which it refers nor otherwise provided them to the court. Hidden Cove also fails to identify any specific allegations in the indictments. Therefore, the court disregards the contents of the indictments for the purposes of this

motion. *See, e.g., Muth v. Dechert, Price & Rhoads,* 391 F.Supp. 935, 938 (E.D.Pa.1975); 5 A. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 1326 (1969 & Supp.); *see also Texas Water Supply Corp. v. Reconstruction Finance Corp.,* 204 F.2d 190, 196-97 (5th Cir.1953) (refusing to allow incorporation by reference of pleadings in other cases).

(d) against the remaining defendants, including Robert Schweiss. Hidden Cove's complaint now alleges that Robert Schweiss was employed by or associated with A–1 Auto, and that he conducted its affairs in part through bribing the mayor of Fox Lake to obtain a towing contract. It is entirely probable that Hidden Cove can supply enough details about the bribes to allege a pattern under *Morgan*. Leave to replead within 30 days is therefore granted.

## CONCLUSION

Defendant Freund's motion to dismiss in *Lauer v. Huddleston, et al.,* No. 85 C 8767, is denied. Defendants' motion for judgment on the pleadings in *H.G. Gallimore, Inc. v. Abdula, et al.,* No. 85 C 7190 is granted, and plaintiffs' pendent state law claims are dismissed for lack of subject matter jurisdiction. Defendant Schweiss' motion to dismiss in *Hidden Cove Marina, Inc. v. Village of Fox Lake, et al.,* No. 86 C 2742, is granted, but Hidden Cove has leave to amend its complaint within 30 days.