Eric P. FERLEGER and Rhonda Ferleger, Plaintiffs,

v.

FIRST AMERICAN MORTGAGE COMPANY, an Illinois corporation, Defendant.

No. 86 C 7281.

United States District Court, N.D. Illinois, E.D.

June 1, 1987.

---

Edward A. Berman, Berman, Roberts & Kelly, Chicago, Ill., for plaintiffs.

Dominic J. Mancini, Hinsdale, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Eric P. Ferleger and Rhonda Ferleger brought this class action against First American Mortgage Company ("First American") after First American failed to obtain a mortgage for them on the terms it had promised. Counts I and II are claims under the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Counts III and IV are pendent claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121-½, ¶ 260 *et seq.* Counts I and III are claims on behalf of the named plaintiffs only. Counts II and IV are claims on behalf of the named plaintiffs and the class they seek to represent.

First American now moves to dismiss the complaint on the grounds that it fails to state a RICO claim on behalf of the named plaintiffs. Because both parties have submitted affidavits and other documentary evidence, the court treats that motion as a motion for summary judgment. Fed.R. Civ.P. 12(b). Defendants also move for an order determining that the action may not be maintained as a class action. Both motions are denied without prejudice to renew them upon a more fully developed record.

## FACTS

According to an affidavit submitted by Thomas Butler, First American's senior vice-president, First American is a mortgage broker licensed by the State of Illinois. First American is not a lender and it does not make conventional mortgages. Rather it is retained by homeowners to locate a lender offering the best mortgage terms available. Typically, a homeowner will contact First American for informa-

tion. If the homeowner is satisfied with the quoted terms, the homeowner submits a loan application to First American. After processing the application, First American submits a loan package to the lender for its underwriting and approval. First American charges a $250 application fee, and it receives a percentage of the principal amount ("points") if and when the loan closes.

According to the complaint, the Ferlegers contacted First American on March 27, 1986, about refinancing the $104,000 first mortgage on their house. First American allegedly told the Ferlegers that it was offering financing at 9.5% interest and 2.25 points.[1] Apparently believing that First American was a mortgage lender rather than a mortgage broker, the Ferlegers submitted a mortgage application and the $250 application fee upon First American's representation that those terms would be "locked in."

Afterwards, the Ferlegers inquired about the status of the loan on several occasions. First American repeatedly assured them that their application was being processed along with other necessary documentation. However, on or about May 20, 1986, First American told the Ferlegers that it was unable to process their loan application in time to secure a mortgage on the terms the Ferlegers thought had been locked in as of March 27. The Ferlegers allegedly then learned for the first time that those rates were only assured for 60 days. First American informed them that there were only five working days left before that period would expire and that it would be impossible to close the transaction within that time.

At the same time, First American told the Ferlegers they would be able to obtain a mortgage on the terms that were then prevailing. First American told them that they could get a mortgage at 9.875% interest and 2.5 points. The Ferlegers initially agreed to the less favorable terms, but

---

**1.** According to Mr. Butler's affidavit, First American would have received 1.5 points if the loan transaction had closed. The lender, Gill-

dorn Mortgage Midwest, would have received 0.75 points.

they informed First American the next day that they had changed their minds. They insisted on getting a mortgage on the original, more favorable terms. First American allegedly told them that the new terms were 9.875% and 2.5 points, and they could take it or leave it.

The Ferlegers claim that they were among many loan applicants who were defrauded by First American. According to the Ferlegers, First American's scheme consisted of enticing people to apply for loans on favorable terms which were supposedly guaranteed. In reliance on those rates, the loan applicants would pay First American's $250 application fee. Without disclosing that the favorable terms were only locked in for a limited period, First American would delay processing the application until the locked-in terms expired. It then would offer the loan applicants a mortgage on terms less favorable to the borrower. The loan applicants could either accept the less favorable terms or look for a mortgage elsewhere, but the application fee would not be refunded. In the meantime, the applicant would have relied on the supposedly locked-in terms in foregoing other mortgage opportunities. Presumably those opportunities were on terms less favorable to the borrower than the supposedly locked-in rates, but more favorable than the mortgage terms eventually obtained through First American or elsewhere.

## I. The Ferlegers' RICO Claim

First American maintains that the Ferlegers have failed to allege virtually every element of a RICO violation. This court reviewed the pleading requirements for stating a RICO claim in *H.G. Gallimore, Inc. v. Abdula*, 652 F.Supp. 437 (N.D.Ill. 1987), and that discussion need not be repeated here. Most of First American's contentions can be rejected summarily.

■ First American contends that the complaint does not identify it as a "person" for the purposes of the RICO statute. But

although the complaint does not expressly state that First American is a "person," the allegations easily support that inference. First American is the only defendant, and the activities on which the Ferlegers' claims are based are all attributable to First American. *Cf. Gallimore*, 652 F.Supp. at 448 (where a complaint consisted of a single count naming three defendants, the court would infer that each was a "person").

■ First American also seems to argue that it cannot be a liable "person" if it is also the alleged "enterprise." First American is correct to the extent that the complaint purports to state a claim under 18 U.S.C. §§ 1962(b) or (c). *Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384, 400 (7th Cir.1984) (corporation cannot be liable under § 1962(c) for conducting its own affairs), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Bruss Co. v. Allnet Communication Services, Inc.*, 606 F.Supp. 401, 407 (N.D.Ill. 1985) (entity cannot be both a liable person and the enterprise under § 1962(b)). However, First American can be a liable person and the alleged enterprise under 18 U.S.C. § 1962(a). *Masi v. Ford City Bank & Trust Co.*, 779 F.2d 397, 401–02 (7th Cir. 1985).

■ First American next argues that the Ferlegers have failed to allege a pattern of racketeering activity. It first contends that the Ferlegers' failure to obtain a mortgage at the rates they were originally quoted constitutes at most a single predicate act. The Ferlegers allege that First American committed mail fraud by using the mail "for delivery and receipt of notices to plaintiffs concerning the documents necessary to effectuate the loan processing ..." (complaint ¶ 14). If the Ferlegers' allegations are true, each mailing would constitute a separate offense under 18 U.S.C. § 1341. *See, e.g., United States v. Ledesma*, 632 F.2d 670, 679 (7th Cir.), *cert. denied*, 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980).[2]

---

**2.** The Ferlegers do not adequately allege wire fraud, however. Intrastate wire transmissions

do not violate the wire fraud statute, and all the telephone conversations involved in this matter

Second, First American suggests that the Ferlegers have not alleged mail fraud because the mailings involved were routine and contained no misrepresentations. But even mailing routine, completely accurate documents can result in a mail fraud violation if the mails were used to further a scheme to defraud. *See United States v. Freitag*, 768 F.2d 240 (8th Cir. 1985); *Gallimore*, 652 F.Supp. at 446; *United States v. Brickey*, 296 F.Supp. 742, 747–48 (E.D.Ark.1969). First American relies on *Brickey*, which involved mail fraud charges against a corporate officer based on routine mailings by the corporation he was allegedly looting. But the court there dismissed several mail fraud counts in the indictment because they were based on mailings completely unrelated to the officer's alleged diversion of funds. In contrast, the complaint here concerns mailings directly related to the Ferlegers' loan application. The facts alleged easily support the inference that the mailings were intended to further the alleged scheme to defraud.

First American contends that the complaint does not comply with Federal Rule of Civil Procedure 9(b). The court disagrees. The complaint adequately describes the alleged scheme to defraud, the nature of the misrepresentations and the individuals involved. The complaint also describes how the mails were used to further the scheme and adequately identifies the kinds of documents that were mailed. That is enough to satisfy Rule 9(b). *See, e.g., Morgan v. Kobrin Securities, Inc.*, 649 F.Supp. 1023, 1028–29 (N.D.Ill.1986). Rule 9(b) does not necessarily require a plaintiff to specifically describe each mailing in the complaint. *See, e.g., Haroco*, 747 F.2d at 405.

First American further argues that the complaint fails to satisfy RICO's pattern requirement, relying on *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322 (7th Cir. 1986). There the Seventh Circuit held that twelve alleged acts of mail fraud did not

constitute a pattern where they all related to a single transaction. However, in *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975–76 (7th Cir.1986), the Seventh Circuit indicated that the existence of multiple victims and distinct injuries would tend to support a finding that a pattern existed. Although the Ferlegers allege that they were only defrauded in a single loan transaction, they also allege that First American defrauded other loan applicants in the same kind of transactions. The court believes that the Ferlegers' complaint, like the complaint in *Morgan*, satisfies both the continuity and relationship aspects of the pattern requirement. *See also Papai v. Cremosnik*, 635 F.Supp. 1402 (N.D.Ill.1986).

First American's remaining arguments are equally unavailing. It argues that the Ferlegers have not alleged that it affects interstate commerce. However, the complaint does contain a conclusory allegation to this effect (complaint ¶ 15). Moreover, the criteria for establishing the required nexus between the enterprise and interstate commerce are not very stringent. *See United States v. Murphy*, 768 F.2d 1518, 1531 (7th Cir.1985) (the Circuit Court of Cook County was an enterprise that "affected commerce—in what it bought, in its effect on the lawyers and litigants who appeared before it"), *cert. denied*, —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). It is difficult to imagine how a mortgage broker could avoid participating in national credit markets, if for no reason other than by dealing with organizations involved in federal housing programs such as the Federal Housing Administration, the Veterans Administration, or the Federal National Mortgage Association. The complaint, at least inferentially, states a sufficient nexus between First American and interstate commerce.

First American also appears to argue that it did not make a profit on its dealings with the Ferlegers, but mail fraud need not be profitable to be actionable. *See, e.g., United States v. Williams*, 728

apparently took place within the state of Illinois. 18 U.S.C. § 1343; *see, e.g., Harris Trust & Savings Bank v. Ellis*, 609 F.Supp. 1118, 1122 &

n. 8 (N.D.Ill.1985), *aff'd*, 810 F.2d 700 (7th Cir. 1987).

F.2d 1402, 1405 (11th Cir.1984). The Ferlegers allege that they lost their $250 application fee and the opportunity to obtain a mortgage on better terms because of First American's alleged RICO violation. Those allegations satisfy the RICO injury requirement. *See* 18 U.S.C. § 1964(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

Both sides have submitted affidavits and other documents to support their positions. Mr. Butler's affidavit describes First American's business in general and the Ferleger transaction in particular. Mr. Butler also describes the Ferleger transaction in detail in a letter to the Illinois Savings & Loan Commissioner, which apparently was prompted by a complaint the Ferlegers filed there. Oddly enough, that letter was submitted by the Ferlegers. These materials suggest that the Ferlegers knew or should have known that the terms First American quoted to them on March 27 were only locked in for 60 days. If they did know, that fact would cast some doubt on whether First American's alleged failure to disclose the 60-day time limit was fraudulent. But Mr. Ferleger stated in his affidavit that he did not learn of the time limitation until May 20, when he discovered that a mortgage would not be available on the terms that had supposedly been locked in. On the present record at least, there appears to be a triable dispute as to this issue.

The materials also indicate that the Ferlegers' application was delayed either because the Ferlegers did not complete the application until March 31 or because First American did not receive the necessary real estate appraisal on time. Either explanation would cast some doubt on the allegation that First American intended to defraud the Ferlegers by purposely delaying their application.

But based on the present record, the court cannot conclude that no reasonable trier of fact could find for the Ferlegers on this issue. The Ferlegers completed their loan application only four days after First American allegedly quoted them supposedly locked-in mortgage terms. First American was responsible for processing the application, including, apparently, obtaining the appraisal. The Ferlegers were not informed of any processing delays or other problems with their loan application until the allegedly undisclosed 60-day time limit had all but expired. First American appears to have both the means and the incentive to manipulate the time needed to process loan applications to take advantage of fluctuations in financial markets. By delaying an application when interest rates are rising, it might be able to avoid its promise to obtain a mortgage on terms that may no longer be readily available and pressure a loan applicant to accept terms more favorable to the lender. Although further development of the record may yet show that no genuine issue of material fact exists for trial, First American is not now entitled to summary judgment on the Ferlegers' claims.

## II. Class Certification

First American also moves for an order determining that this action may not be maintained as a class action. The Ferlegers apparently seek class certification under Fed.R.Civ.P. 23(b)(3) (questions of law or fact common to the members of the class predominate over any questions affecting only individual members), and they have the burden of showing that certification is appropriate. *See, e.g., Eggleston v. Chicago Journeymen Plumbers Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). But at this stage the record consists only of the Ferlegers' complaint and certain affidavits and documents pertaining chiefly to their individual claims. On such a record, First American's motion is subject to the standard announced in *Adashunas v. Negley*, 626 F.2d 600 (7th Cir.1980):

> In order to state a class action claim upon which relief can be granted, there must be alleged at a minimum (1) a reasonably defined class of plaintiffs, (2) all of whom have suffered a constitutional or statutory violation (3) inflicted by the defendants.

626 F.2d at 603–04 (affirming an order denying class certification based on the complaint, where the alleged class of plaintiffs was "so highly diverse and so difficult to identify that it is not adequately defined or nearly ascertainable"); *see Galindo v. Del Monte Corp.*, 382 F.Supp. 464, 470–71 (N.D.Ill.1974) (Bauer, J.) (refusing to dismiss a class complaint where "[t]here appear to be no manageability problems or technical defects on the face of the complaint as to the class allegations"). Unlike the complaint in *Adashunas*, the Ferlegers' class allegations meet that minimum standard. Accordingly, First American's motion must be denied.

However, at this stage the record is too sketchy to permit a definitive ruling on the class certification issues. *See Eggleston*, 657 F.2d at 895 ("the pleadings are expected to be of some assistance [in deciding class certification issues], but more information may be needed"); *McCray v. Standard Oil Co. (Indiana)*, 76 F.R.D. 490, 499 (N.D.Ill.1977) ("maintainability may sometimes be determined on the basis of the pleadings, but ordinarily the determination should be predicated on more information than the pleadings will provide"). The court will defer such a ruling pending further submissions by the parties, but the parties are directed to develop those issues promptly. *See* Fed.R.Civ.P. 23(c)(1) ("As soon as practicable after the commencement of an action as a class action, the court shall determine by order whether it is to be so maintained."); *Watkins v. Blinzinger*, 789 F.2d 474, 475 n. 3 (7th Cir. 1986).

## CONCLUSION

First American's motion to dismiss is treated as a motion for summary judgment and that motion is denied. First American is free to file a new summary judgment motion upon a more fully developed record. First American's motion for an order determining that this action may not be maintained as a class action is also denied. However, the parties are directed to develop the class certification issues as promptly as possible so that a definitive ruling on class certification may be made.