**P & P MARKETING, INC., Plaintiff,**

v.

**Richard A. DITTON & Elaine Ditton, Defendants.**

**No. 90 C 1045.**

United States District Court, N.D. Illinois, E.D.

Sept. 26, 1990.

---

**1356**

Michael A. Reiter, Kathleen C. Spears, Holleb & Coff, Chicago, Ill., for plaintiff.

Nathan H. Dardick, Morton Denlow, Stuart Gimbel, Dardick & Denlow, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

This matter comes before the court on defendants', Richard and Elaine Ditton, motion to dismiss plaintiff's, P & P Marketing, Inc. ("P & P"), complaint for failure to state a cause of action or in the alternative to stay the proceedings pending resolution of a related state-court action. This action arises out of certain allegedly fraudulent transactions between plaintiff, P & P, and a corporation, Incredible Technologies, Inc. ("IT"), of which defendants are officers and directors and majority shareholders. Jurisdiction is founded upon a federal question involving Count I, which alleges a violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 USC §§ 1961 *et seq.* Count II is a state law fraud claim based upon the same facts as Count I.

### Motion to Dismiss

■ Defendants have moved to dismiss plaintiff's Section 1962(c) RICO count for failure to state a cause of action. FRCP Rule 12(b)(6). In considering such a motion, a court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to the relief requested. *Cruz v. Beto,* 405 U.S. 319, 323, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Morgan v. Bank of Waukegan,* 804 F.2d 970, 973 (7th Cir. 1986). The court must accept all well

pleaded material facts as true and make all reasonable inferences therefrom in favor of the plaintiff. *Bruss Co. v. Allnet Communication Services, Inc.*, 606 F.Supp. 401, 404 (N.D.Ill.1985). However, the court should not strain to find inferences that do not appear from the face of the complaint. *Id.*

### RICO

Civil actions for RICO violations are authorized by Section 1964(c) which provides that "[a]ny person injured in his business or property by reason of a violation of Section 1962" may recover treble damages and costs including attorney's fees. 18 USC § 1964(c); *H.G. Gallimore, Inc. v. Abdula,* 652 F.Supp. 437 (N.D.Ill.1987). Section 1962 sets out the prohibited conduct. 18 USC § 1962(a)-(d); see *Id.* at 439, 440. Plaintiff has alleged that defendants violated Section 1962(c) which prohibits

> [A]ny person employed by or associated with any enterprise, engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 USC § 1962(c).

Regardless of which subsection of Section 1962 defendants are alleged to have violated, five elements are common and necessary to every civil RICO claim. These essential elements are: (1) a "person"; (2) an "enterprise" engaged in or affecting interstate commerce; (3) "racketeering activity" which (4) occurred in a "pattern" and (5) an injury. *Id.* at 440; 18 USC § 1962(a)-(d). Defendants' motion to dismiss is directed at two of these elements. Defendants contend that (1) plaintiff has failed to sufficiently plead the necessary predicate acts of "racketeering activity" and (2) have failed to allege facts sufficient to demonstrate a "pattern of racketeering activity".

#### (I) *Plaintiff's Allegations*

The following is taken from the first twenty-six paragraphs of plaintiff's complaint.

### The Parties

Plaintiff, P & P, is engaged in the business of marketing and distributing computer-based entertainment products. Edward Pellegrini is an officer and director of P & P and owns 50% of P & P's outstanding shares.

Defendants, the Dittons, are officers and directors and majority shareholders of IT and Strata Inc. ("Strata"). The Dittons control both IT and Strata. IT is engaged in the business of designing computer software and hardware for use in video games and related applications. Strata is a company through which a video game "Strata Bowling" was developed. Additionally, it is alleged that at all relevant times, IT has been engaged in, or the activities of IT have affected, interstate commerce and that IT is an "enterprise" as that term is defined in 18 USC § 1961(4).

### The Joint Venture/"Capcom Bowling Kit"

In April 1987, IT, P & P and a Joseph Kaminkov entered into an oral joint venture agreement to develop and market a video bowling kit (the "Capcom Bowling Kit"). Pursuant to this agreement, the parties agreed, *inter alia*, that IT would develop both the software and hardware for the kits; P & P would market and sell the kits; P & P would advance or reimburse to IT certain funds for the development of the kits; and Kaminkov would assist in the design of the kit and its graphics and would assist in marketing the kits. The members of the joint venture agreed that the technology, graphics, software and hardware would be owned in the following ratios: 40% by IT; 40% by P & P; and 20% by Kaminkov.

Sometime after the joint venture was formed, the Dittons on behalf of IT, orally requested that P & P allow IT to order the electronic components and hardware for the Capcom Bowling Kits directly from third-party suppliers in IT's name. In this way the Dittons and IT could make important industry contacts and establish IT's

reputation and credit in the industry. IT would be advanced or reimbursed for the actual costs of these parts by P & P. P & P orally agreed and thereafter from approximately September of 1987 through October of 1989, IT ordered the parts for the Capcom Bowling Kits directly from third-party suppliers and upon periodic requests by IT, P & P would advance or reimburse IT for the actual costs of the parts. IT represented to P & P that the actual cost of the parts for each Capcom Bowling Kit was approximately $223, of which $145 represented the cost of the printed circuit board ("PCB") for each kit and the balance represented the cost of the other electronic components.

### The Dittons' Scheme to Defraud P & P/Capcom Overcharges

P & P alleges that from September 1987 through October 1989, the Dittons caused IT to overcharge P & P for the PCB and electronics to be used by IT in the Capcom Bowling Kits. Specifically, P & P claims that although IT represented to P & P that the actual cost of each PCB was $145. IT's actual cost was less than $130 per PCB. P & P alleges that the Dittons caused IT to purchase the parts for the Capcom Bowling Kits at significant discounts offered by third-party suppliers but caused IT to send invoices and other documents to P & P which reflected the higher non-discounted cost of these parts. The Dittons caused IT to wrongfully keep the difference between the actual or discounted price of the parts and the price charged by IT to P & P without informing P & P of the discounted prices.

From approximately September 1987 through October 1989, P & P reimbursed or advanced IT as least $165,000 in overcharges which the Dittons, on behalf of IT, represented to be the actual cost of just the PCB for the Capcom Kits alone. The Dittons have caused IT to fail or refuse to comply with P & P's request for full disclosure of information concerning IT's actual costs for the parts for the Capcom Bowling Kits.

Additionally, the Dittons have caused IT to buy an excessive number of parts and other unnecessary services related to the Capcom Bowling Kits. The Dittons caused IT to deliver or mail to P & P invoices on IT's stationary for these parts and services in vague terms and to demand reimbursement from P & P. P & P, in reasonable reliance on the Dittons' representations that such parts and services were necessary to the production of the Capcom Bowling Kits, paid the IT invoices. P & P alleges it paid to IT approximately $207,681 for these excessive parts and services and further alleges that the Dittons caused IT to use the extra parts and unnecessary services for IT's development of its own video games and projects.

Finally, P & P alleges the Dittons caused IT to send other invoices to P & P for parts wholly unrelated to the Capcom Bowling Kits or any other projects related to the joint venture. P & P claims they paid in excess of $6,000 on such invoices.

### Strata Bowling

P & P also alleges that the Dittons, through their company, Strata Inc., developed their own video game "Strata Bowling" which copied much of the Capcom Bowling Kit's features and used the same hardware as the Capcom Bowling Kits and Grudge Match Wrestling Kits referred to below. The Dittons' actions were in disregard of and in violation of the joint venture concerning the Capcom Bowling Kits.

When P & P learned of the development of the Strata Bowling Game and warned the Dittons that they were violating the joint venture agreement, the Dittons caused IT to turn over to P & P certain electronic parts and components which IT had intended to use for the Strata Bowling game. The Dittons, on behalf of IT, demanded that P & P pay to IT, IT's actual cost of these parts which the Dittons represented to be approximately $75,000. In reasonable reliance on the Dittons' representations concerning the actual cost of such parts, P & P paid IT $75,000 for these parts. On information and belief, P & P alleges that the Dittons caused IT to misre-

present to P & P the actual cost of such parts.

### Grudge Match Wrestling Kit

Sometime after the joint venture involving the Capcom Bowling Kit was formed and before P & P discovered the alleged fraud, P & P and the Dittons, on behalf of IT, entered into an additional oral agreement concerning the development of a coin-operated video wrestling kit to be called "Grudge Match" and to be sold by P & P. Similar to the agreement concerning the Capcom Bowling Kits, IT was to develop the software and hardware for Grudge Match and P & P was responsible for marketing and sales. Around June of 1988, P & P advanced IT $16,000 for the development costs of Grudge Match.

P & P and the Dittons, on behalf of IT, agreed that the information concerning development and sale of Grudge Match was proprietary and belonged to P & P. From mid–1988 until this case was filed, the Dittons, on behalf of IT, represented to P & P that the PCB and software developed by IT for the Grudge Match Kit would be totally original and be created solely for use in the Grudge Match Kit.

Sometime after P & P advanced IT, the $16,000 for development of Grudge Match, the Dittons, on behalf of IT, demanded that P & P turn over all ownership rights, including patents and copyrights, concerning Grudge Match. Richard Ditton threatened that if P & P did not agree to such a transfer, IT would cease working on all of its projects with P & P including the Capcom Bowling Kit and ESAC debit card system described below. P & P claims these threats obstructed and delayed the movement of P & P's property through commerce and created a reasonable fear of economic loss on P & P's part. P & P promised to turn over these ownership rights.

From approximately July 1988 through September of 1989, the Dittons told P & P that the Grudge Match Kit was near completion and being tested. These representations were false. IT has not completed the Grudge Match Kit and has failed to develop the kit for testing and marketing. During 1989, P & P advanced IT approximately $257,900 for parts which the Dittons represented were bought by IT for use in the manufacture of Grudge Match Kits. Additionally, P & P spent approximately $40,000 in advertising and promotion costs related to Grudge Match. P & P demanded that IT refund the development costs and costs of parts advanced to IT by P & P. IT refused but did turn over some parts allegedly bought to manufacture Grudge Match Kits but which P & P found of no value for future development of Grudge Match Kits.

In addition to the allegations of extortion and fraud involving Grudge Match, the Dittons allegedly caused IT to use the software developed by IT for another consumer video game, "Championship Wrestling", in the software for Grudge Match Kits. P & P alleges upon information and belief, that the manufacturer of Championship Wrestling, like P & P, paid IT to develop original software. Similarly, P & P alleges the Dittons caused IT to use hardware, developed exclusively for Grudge Match in a game called "Wheel of Fortune", which was developed by IT for manufacture by GameTek. P & P also alleges the Dittons caused IT to wrongfully use Grudge Match hardware for IT's own "Golden Tee" video golfing game. Finally, P & P alleges on information and belief, that the Dittons caused IT to use the United States mails and interstate telephone wires in furtherance of this fraud upon P & P in violation of the mail and wire fraud statutes. 18 USC §§ 1341 and 1343.

### The ESAC Card System

Around August of 1987, P & P requested that IT redesign a computerized debit card system known as the ESAC debit card system ("ESAC"). ESAC is designed to be used as a credit card to purchase items from various vending machines and coin-operated laundry machines as well as to play video games. Edward Pellegrini holds the patent on the prototype for the ESAC system which belongs to P & P. The Dittons caused IT to enter into this oral agreement

by which IT agreed to redesign the ESAC system for mass production by P & P. The Dittons represented that IT had the expertise and ability to effect such a redesign. IT was to be paid $60,000 and return a finished ESAC system to P & P within six months.

P & P, in late 1987, paid IT $49,000 as an initial payment of the $60,000 price plus an additional $3,000 was paid by P & P to Vertex Industries, Inc. for a currency changer which was delivered to IT for use as part of the ESAC system. P & P, on information and belief, alleges that in mid-1988, the software which would allow the currency changer to communicate with the ESAC system was sent by Vertex to IT through the use of the United States mail or interstate telephone wires. Additionally, P & P states that the United States mail was used to send invoices from Vertex to P & P and IT for the software for the currency changer.

P & P claims that the Dittons have intentionally caused IT to fail to deliver to P & P the redesigned ESAC system and further have caused IT to retain and refuse to return the money P & P paid for development of the redesigned ESAC system. Further, P & P claims that the Dittons have caused IT to retain and refuse to return to P & P all of the hardware, software and technical information relating to the ESAC system, including the currency changer.

P & P claims that the conduct of the Dittons was part of a scheme to defraud P & P by getting P & P to relinquish to IT valuable property and proprietary information concerning the ESAC system which belongs to P & P. P & P further claims on information and belief, that the Dittons have caused IT to retain the hardware and software relating to ESAC in an attempt to extort payment by P & P out of monies not owed to IT. P & P claims the Dittons never intended to deliver the ESAC system as promised.

### Violation of RICO/Section 1962(c).

Plaintiff's complaint incorporates paragraphs 1–26 and in paragraphs 27–34, plaintiff sets out its allegations which plaintiff maintains states a civil cause of action for defendants' violation of Section 1962(c). The court has taken the liberty of organizing these allegations with reference to certain of the necessary elements for a RICO claim under Section 1962(c).

### Prohibited Conduct

Plaintiff alleges the Dittons conducted the affairs of IT and Strata through a pattern of racketeering activity. Specifically, the Dittons caused IT or Strata to defraud P & P in the activities related to the Capcom Bowling Kit by causing IT or Strata to undertake the following acts: (1) overcharging P & P for electronic components and parts used by IT in the assembly of the Capcom Bowling Kit; (2) demanding and accepting reimbursement from P & P for excessive numbers of electronic components and parts which IT falsely represented it had purchased for the Capcom Bowling Kit; (3) concealing from P & P, IT's development of the Strata Bowling Kit which would compete directly with the Capcom Bowling Kit; and (4) demanding reimbursement from P & P for parts which IT bought, but which were completely unrelated to the Capcom Bowling Kit.

As to the Grudge Match affair, plaintiff alleges that the Dittons caused IT to enter into the scheme to defraud P & P out of its money advanced to IT for development costs and costs of parts relating to Grudge Match and, through IT, tried to extort the ownership rights of the Grudge Match technology from P & P.

Plaintiff also alleges that the Dittons intentionally caused IT to fail to deliver to P & P the ESAC debit card system as promised and such acts were a scheme to defraud P & P of money and valuable proprietary information of P & P relating to the ESAC system.

### Racketeering Activity/Predicate Acts

Plaintiff alleges that in order to accomplish the scheme to defraud P & P through overcharges on the Capcom Bowling Kit, the Dittons caused IT and Strata to use the United States mail and interstate telephone

wires in violation of 18 USC §§ 1341 and 1343. Specifically, plaintiff alleges upon information and belief that from approximately April 1987 through October of 1989, IT and Strata received hundreds of invoices through the U.S. mails from third-party suppliers and that IT and Strata constantly telephoned these suppliers in states outside of Illinois to discuss the cost and shipment of parts used by IT and for which IT overcharged P & P. Additionally, it is alleged that numerous checks to these suppliers to pay for these parts were deposited in the U.S. mails between April 1987 and October 1989. Finally, it is alleged that the Dittons caused IT to mail numerous documents to P & P requesting payment for the allegedly inflated invoices.

Similarly, it is alleged upon information and belief that in furtherance of the scheme to defraud P & P relative to the Grudge Match agreement, the Dittons caused IT to receive and send invoices for the parts and components of Grudge Match through the U.S. mails from or to third-party suppliers. Plaintiff also alleges that the Dittons caused IT to use interstate wires to further their fraud upon P & P concerning Grudge Match. These acts were alleged to constitute mail and wire fraud in violation of 18 USC §§ 1341 and 1343.

Lastly, plaintiff alleges that the Dittons used IT to commit extortion in violation of 18 USC § 1951. Specifically, it is alleged that Richard Ditton threatened to withhold development and production by IT of all P & P projects unless and until P & P agreed to turnover the ownership rights to the Grudge Match technology to IT. This threat caused P & P to reasonably fear economic loss and obstructed, delayed or otherwise, affected the movement of P & P's property in commerce. (Complaint ¶ 19.)

### Pattern of Racketeering Activity

It is alleged that the above acts of racketeering activity were related to each other in that they were in furtherance of one or more of the three separate schemes to defraud P & P, and involved the same participants, victim and methods of commission (mail and wire fraud, extortion). It is alleged that the Dittons have caused IT and Strata to engage in mail and wire fraud and extortion as a regular way of transacting business as evidence by the three separate schemes to defraud P & P. Further, it is alleged that IT still retains P & P's proprietary information relating to Grudge Match and the ESAC system and these actions threaten to continue into the future.

### Injury

Plaintiff alleges that the Dittons conduct in violating Section 1962(c) has caused P & P damage in the following respects: (1) as to the Capcom Bowling Kits, P & P has paid to IT approximately $160,000 in overcharges for the cost of the PCB's as a result of IT's misrepresentations of the actual costs; $207,000 for an excessive number of parts and services which IT allegedly bought for use on the kits; $6,000 for parts totally unrelated to the kits or any project of the joint venture; (2) as to Grudge Match, P & P has paid to IT $16,000 for development costs; paid to IT $257,000 for parts for development and production; and P & P has incurred $40,000 in advertising and promotional costs; (3) as to the ESAC debit card system, P & P has paid $49,000 to IT for research, development and redesign. P & P seeks at least $735,000 in compensatory damages, a treble award and costs under 18 USC § 1964(c) and other appropriate relief.

### (II) Racketeering Activity/Sufficiency of Pleading

Defendants contend that plaintiff has failed to allege the necessary predicate acts of racketeering activity with sufficient particularity. The notice pleading requirements of Rule 8 and 9 of the Federal Rules of Civil Procedure ("FRCP") govern the pleading of a civil RICO cause of action. In pleading racketeering activity, the plaintiff must allege sufficient facts to specify the nature of the predicate acts to a degree that will allow each defendant to comprehend the specific actions to which they are required to answer. *Ray v. Karris*, 780 F.2d 636 (7th Cir.1985). Each offense list-

ed as a predicate act must be pleaded and supported by sufficient allegations which, if true, would establish the offense. *Id.* Additionally, where the predicate act relied upon is an offense involving fraud, FRCP Rule 9(b) requires that allegations of fraud be pleaded with "particularity" as to the circumstances of the alleged fraud. *Haroco, Inc. v. American National Bank & Trust of Chicago,* 747 F.2d 384 (7th Cir. 1984), aff'd on other grounds, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). To be sufficient, the allegations of fraud must contain the facts describing the time, place and contents of the false representations, and the full nature of the transaction and scheme to defraud, including the identities of the persons making the representation and the manner of communication. *Id.; H.G. Gallimore,* 652 F.Supp. at 441; *McKee v. Pope, Ballard, Shepard & Fowle, Ltd.,* 604 F.Supp. 927 (N.D.Ill.1985). Further, it is important to note that even where the predicate acts do not involve fraud, "time and place" averments are treated as material and are to be considered like all other averments of material matter. FRCP Rule 9(f).

■ For purposes of the predicate acts of mail and wire fraud, 18 USC §§ 1341 and 1343, it is not required that the false representations be sent through the U.S. mails or made through the use of interstate wires. *U.S. v. Lea,* 618 F.2d 426, 430 (7th Cir.1980). It is only necessary to have a scheme to defraud coupled with a mailing or use of interstate wires in furtherance of the scheme and the use of the mails or interstate wires need not be an essential part of the scheme, but it is sufficient if such use is incident to an essential component of the scheme. *Id.* The defendant need not have personally used the mails or interstate wires, it is sufficient that their use by others was reasonably foreseeable. *U.S. v. Massa,* 740 F.2d 629, 642 n. 7 (8th Cir.1984).

■ Where there are multiple defendants, the complaint must inform each defendant of the specific act allegedly committed by the defendant justifying his inclusion in a particular count. *McKee,* 604

F.Supp. at 931. However, where the defendants are corporate insiders or control the actions of an entity, this requirement is subject to some modification, especially in situations where defendants are in a better position to know the extent of each defendant's participation in the complained of conduct. *See Banowitz v. State Exchange Bank,* 600 F.Supp. 1466 (N.D.Ill.1985). The key question is whether each defendant is given sufficient notice of their respective roles in order that they may answer the complaint. *Id.; Haroco,* 747 F.2d at 405 (Rule 9(b) only requires a general outline of a fraudulent scheme and reasonable notice as to each defendant's respective role).

(A) *Sufficiency of the Allegations Concerning Capcom Bowling Kits*

Defendants' Rule 9(b) attack upon plaintiff's allegations of mail and wire fraud in relation to the Capcom Bowling Kits is three-pronged. Defendants contend that: (1) P & P has failed to allege with sufficient particularity which component parts P & P was overcharged on and which of the hundreds of invoices and other numerous documents mailed to P & P over the two and one-half year period contained fraudulent representations; (2) P & P has failed to allege to a sufficient degree which specific acts each defendant allegedly committed; (3) to the extent P & P relies upon information and belief, P & P has failed to allege specific facts upon which such belief is founded.

■ The court disagrees with defendants' contentions. The nature of defendants' alleged scheme to obtain money from P & P by submitting false invoices concerning the actual costs of the PCB's for the Capcom Bowling Kits is adequately alleged to notify defendants of the nature of the allegedly fraudulent transactions at issue. Defendants have also been given adequate notice of the relevant time period involved and the representations at issue. The sufficiency of allegations of fraud necessarily varies with the complexity of the transaction as where numerous transactions are involved and occur over an ex-

tended period of time. *Baselski v. Paine, Webber, Jackson & Curtis, Inc.*, 514 F.Supp. 535, 540 (N.D.Ill.1985). In such situations, less specificity is required. *Id.* Defendants have been adequately informed that from April of 1987 through approximately October of 1989, they allegedly caused IT and Strata to use the U.S. mails and interstate wires in the discussion, sending, and payment of invoices for the PCB's for the Capcom Bowling Kits and that defendants then caused IT to send invoices containing false representations of the actual costs of the PCB's to P & P for payment which was made by P & P through the mail. It is not necessary under this factual situation involving hundreds of invoices over an extended period of time to require plaintiff to describe each specific mailing or use of interstate wires in the complaint. *See Ferleger v. First American Mortgage Co.*, 662 F.Supp. 584, 588 (N.D.Ill.1987).

■ Nor has plaintiff failed to adequately allege each defendants' participation in the conduct alleged. Defendants are husband and wife and both are officers and directors of IT and Strata and are alleged to control IT and Strata. It is consistently alleged that both defendants caused IT and/or Strata to undertake the various actions involved in the Capcom Bowling incidents. Defendants are in a better position than plaintiff to know which of them or other employees of IT actually performed the specific acts alleged. Defendants have been given sufficient notice to answer the allegations of the complaint as to their actions. *See Banowitz*, 600 F.Supp. at 1469.

Pleading based upon information and belief is not as problematical as it might first appear. *See generally*, Wright and Miller, Vol 5, *Federal Practice and Procedure, Civil*, § 1224 (West, 1969). Reliance on information and belief may be a desirable and necessary expedient where the matter is not within the personal knowledge of the pleader and the pleader has had to rely on information furnished by others. *Id.* However, such pleading may be improper where the matter is or may be presumed

within the personal knowledge of the pleader, unless other facts rebut that presumption. *Id.* Additionally, FRCP Rule 11 provides that all pleadings must be signed by the party or the party's attorney and such signature indicates that the facts alleged are made in good faith after reasonable inquiry and are based upon "knowledge, information and belief". *Id.*

While plaintiff has not alleged the facts upon which it believes that IT and Strata have used the U.S. mails and interstate wires relative to the invoices and payments to third-party suppliers, such matters are more likely within the particular knowledge of the defendants and Rule 11 leads to the inference that plaintiff has a good faith basis for believing in the existence of the facts alleged. The facts alleged are specific enough for purposes of allegations of fraud under FRCP Rule 9(b). Similarly, plaintiff specifically alleged that IT represented the actual cost of the Capcom PCB's to be $145 where the actual cost charged by the third-parties to IT was only $130. The absence of the facts which support plaintiff's belief do not interfere with the reasonable notice to defendants of the specific nature of the alleged fraudulent representations. Further, the facts which would support these allegations are particularly available to defendants and plaintiff has alleged that defendants have caused IT to fail to disclose to plaintiff such information. If in fact, IT did not overcharge P & P, and plaintiff failed to adequately investigate such facts, then Rule 11 sanctions may be in order. However, Rule 9(b) requirements should not be interpreted to require a pleading to go beyond the specifics of a fraudulent scheme and demonstrate compliance with Rule 11 investigation requirements. *See generally, Haroco*, 747 F.2d at 405; *but see, Bruss Co.*, 606 F.Supp. at 405.

Although not raised by defendants, plaintiff's allegations concerning the Capcom Bowling Kit fraud fail to allege that Strata, Inc. is an "enterprise" as defined in 18 USC § 1961(4). This failure to allege a necessary element prevents plaintiff from relying upon the Dittons' conduct of Strata, Inc.'s activities through a pattern of racke-

teering activity in establishing a violation of Section 1962(c). This likely oversight can be easily fixed upon repleading.

Plaintiff has also failed to allege that the documents requesting payment by P & P to IT of the inflated and fraudulent Capcom parts invoices were made through the "U.S." mails. Plaintiff only alleges that they were made through the mails. (See Complaint ¶ 29.) This is not sufficient to establish the predicate act of mail fraud. 18 USC § 1341. However, this does not alter the court's conclusion that the other mailings discussed are sufficient to allege the predicate acts of mail fraud.

### (B) *Sufficiency of the Allegations Concerning Grudge Match*

■ Defendants also contend that plaintiff has failed to sufficiently allege the predicate acts of mail and wire fraud relative to the alleged scheme to defraud P & P with respect to the Grudge Match Kits. Specifically, defendants contend that plaintiff: (1) failed to sufficiently allege when the fraudulent representation concerning IT's promise to deliver a completed Grudge Match Kit was made; (2) failed to allege the use of the United States mails or interstate wires in furtherance of this scheme as required by 18 USC §§ 1341 and 1343; (3) failed to sufficiently allege the specifics of the fraud concerning the use of allegedly non-original software in Grudge Match.

While the nature of the allegedly fraudulent transactions concerning Grudge Match are adequate to meet Rule 9(b) requirements, plaintiff's allegations are lacking with respect to time and place. Unlike plaintiff's allegations concerning IT's interaction with third-parties relative to the Capcom Kits or the numerous demands for payment by IT from P & P for Capcom overcharges, the allegations of various representations concerning Grudge Match are not so numerous or not within the knowledge of plaintiff so as to relax the requirements of pleading the Grudge Match fraud with particularity as to time and place. FRCP Rule 9(b) and (f); *Baselski*, 514 F.Supp. at 540. Plaintiff only alleges that sometime after the joint venture involving the Capcom Bowling Kits was formed and before P & P discovered the fraud, IT entered the agreement concerning Grudge Match. This period could be anywhere between mid–1987 to October of 1989. Certainly, plaintiff as a participant to the agreement can allege a more specific time period. Similarly, the allegations concerning the representations that the Grudge Match technology would be original and exclusive and owned by P & P can be pleaded more specifically than between mid–1988 and the present. The same is true for plaintiff's allegations that between July 1988 through September 1989, the Dittons told P & P that the Grudge Match Kit was near completion and being tested. As to IT's alleged use of non-original software for Grudge Match and use of original and exclusive Grudge Match hardware in IT's "Wheel of Fortune", while the specific time of these events is not likely within plaintiff's knowledge, no time frame whatsoever is alleged.

Additionally, plaintiff's allegations concerning the use of the U.S. mails and interstate wires is lacking in many respects. The only specific allegations of mail and wire fraud concern IT's use of the U.S. mails to receive and send invoices and related documents between IT and third-party suppliers concerning parts for the Grudge Match Kits for which P & P ultimately paid $257,000. While the use of the mails as alleged leads to an inference that such use was in furtherance of a scheme to defraud P & P of the costs for the Grudge Match development and parts, no time period is mentioned at all. Even more problematic are plaintiff's bare allegations that the Dittons caused IT to use interstate wires in furtherance of this scheme. No facts whatsoever are alleged in support of this conclusory allegation and they are, therefore, insufficient. *See Ray v. Karris*, 780 F.2d at 644. In summary, plaintiff's allegations of the predicate acts of mail and wire fraud in relation to the Grudge Match agreement and activities are insufficient to give defendants adequate notice and fail to sufficiently allege facts in support of the predicate acts of mail and wire fraud.

*Grudge Match/Extortion*

■ Defendants do not address the sufficiency of plaintiff's allegation concerning the predicate act of extortion. 18 USC § 1951. However, the court finds plaintiff to have adequately alleged this predicate act. While extortion is not a fraud requiring pleading in compliance with FRCP Rule 9(b), sufficient facts must be alleged that, if true, would support a finding that the offense of extortion had been committed. *See Ray v. Karris*, 780 F.2d 636. Plaintiff has alleged, *inter alia*, that Richard Ditton caused IT to obtain the property of P & P with P & P's consent, and this was induced by the wrongful use of actual or threatened fear. *See Sutherland v. O'Malley*, 882 F.2d 1196, 1202 (7th Cir.1989); 18 USC § 1951(b)(2). Extortion by fear of economic loss may be established by proof that the victim, P & P, reasonably believed that defendants had the power to harm the victim and that the defendants would exploit such power to the victim's detriment. *Id.* Finally, use of extortion as defined in Section 1951(b)(2) must have obstructed, delayed or affected commerce as defined in Section 1951(b)(3). 18 USC § 1951(a). Commerce is defined broadly and includes commerce between any point within a state. 18 USC § 1951(b)(3). Plaintiff alleged all the necessary elements to establish a violation of Section 1951, which is a predicate act of racketeering under RICO. 18 USC § 1961(1).

(C) *Sufficiency of the Allegations Concerning the ESAC System*

■ Similar to their prior contentions, defendants argue that plaintiff's allegations concerning the alleged scheme to defraud P & P over the ESAC system lack sufficient particularity under the requirements of FRCP Rule 9(b). Plaintiff alleged that the Dittons caused IT to promise to deliver a redesigned ESAC system within six months of August 1987 and that the Dittons caused IT to wrongfully refuse to deliver such a redesigned ESAC system or return P & P's property and money advanced to IT for the redesign of the ESAC system. Plaintiff also alleged that the Dittons never intended to cause IT to fulfill the agreement and that IT has or continues to retain P & P's money and property. These allegations, if true, could support the conclusion that the Dittons "devised [a] scheme … to obtain money or property [from P & P] by means of false pretenses, representations or promises". 18 USC § 1341, 1343. Additionally, plaintiff alleged the time, late August of 1987, at which it paid IT the $49,000 of the initial price and also paid to Vertex the $3,000 for the currency changer. Plaintiff went on to allege that in mid–1988, the software for the currency changer was sent by Vertex to IT through the use of U.S. mails or interstate wires and that P & P and IT were sent invoices from Vertex for such software through the U.S. mails. These allegations allow a reasonable inference that this use of the U.S. mails and interstate wires were reasonably foreseeable by the Dittons and IT and that such use of the mails and interstate wires were in furtherance of a scheme to obtain money and property from P & P through false representations. Accordingly, plaintiff has alleged with sufficient particularity the predicate acts of mail and wire fraud in connection with the ESAC debit card system.

■ However, plaintiff's bare allegations that the Dittons have caused IT to retain the hardware and software relating to the ESAC system in an attempt to extort payment from monies not owed to IT are mere conclusory allegations not supported by facts and fail to sufficiently allege the predicate act of extortion.

(III) *"Pattern of Racketeering Activity" Requires "Continuity Plus Relationship"*

■ Defendants contend plaintiff failed to adequately allege a pattern of racketeering activity. As a necessary element of any civil RICO claim, a plaintiff must allege a "pattern of racketeering activity". *See* 18 USC § 1962(a)-(d); *H.G. Gallimore, Inc. v. Abdula*, 652 F.Supp. 437, 441 (N.D. Ill.1987). Section 1961(5) provides:

"pattern of racketeering activity" requires at least two acts of racketeering

activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

18 USC § 1961(5). Section 1961(5) defines "pattern" in terms of minimum, not necessary, requirements. 18 USC § 1961(5); *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

In *Sedima,* the Court rejected attempts to narrow or limit civil RICO actions by interpreting the injury element to require a special "racketeering injury" as opposed to just an injury resulting from the conduct alleged to constitute the violation of RICO. 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346. The Court recognized the "extraordinary" uses to which civil RICO has been put and suggested that future attempts by the courts to narrow civil RICO be directed towards development of a "meaningful concept of 'pattern'". *Sedima,* 473 U.S. at 500, 105 S.Ct. at 3287. In the now famous footnote fourteen the Court stated:

> [T]he definition of a "pattern of racketeering activity" ... states that a pattern *"requires* at least two acts of racketeering activity", § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern". The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern". S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

*Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. The Court also noted that Congress in defining pattern in a later provision of the same bill stated "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events". *Id.* (quoting 18 USC § 3575(e)).

After numerous and conflicting attempts by lower courts to develop a useful concept of "pattern", the Court finally addressed the continuity plus relationship requirements of a pattern of racketeering activity discussed in footnote fourteen of *Sedima. H.J. Inc. v. Northwestern Bell Telephone,* — U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court stated that Congress' failure to give a clearer indication of what the pattern requirement of RICO entailed, required the Court to adopt a "flexible approach" to the establishment of a pattern. *Id.* 109 S.Ct. at 2900. The Court held that RICO envisioned "a concept of sufficient breadth that [the pattern element] might encompass *multiple predicates* within a single scheme that were *related* and that *amounted to, or threatened the likelihood of continued criminal activity".* *Id.* at 2899 (emphasis added). The Court rejected the Eighth Circuit's requirement that more than a single scheme must be alleged to support a civil RICO claim. *Id.* Thus, a pattern of racketeering activity requires (1) a relationship between predicate acts and (2) predicate acts that amount to or threaten continued criminal activities. *Id.* at 2900. Proof of these two constituents of pattern, although stated separately for analytical purposes, will overlap. *Id.* The Court defined "relationship" for purposes of a RICO pattern consistently with the Dangerous Special Offender Sentencing Act, 182 USC §§ 3575 *et seq.* (now partially repealed). A defendant's predicate acts must have some relationship to one another by virtue of having similar " 'purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events' " *Id.* at 2901 (quoting 18 USC § 3575(e)).

It is the "continuity" aspect of pattern which has proven to be an elusive concept.

The Court noted that emphasis by lower courts upon the predicate acts amounting to, or threatening the use of or continued racketeering activity had spawned the "multiple scheme" test adopted by the Eighth Circuit and numerous lower courts. *H.J. Inc.*, 109 S.Ct. at 2901. Although proof of multiple schemes may be highly relevant to continuity, they are not a requirement. *Id.*[1] A plaintiff must prove "continuity of racketeering activity, or its threat, *simpliciter*". *Id.*

The Court found the formulation of a general test for continuity difficult in the abstract but attempted to delineate this requirement.

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition [citation omitted]. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear to one another, are distinct requirements ... [Continuity may be demonstrated] over a closed period of time by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months, and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with longterm criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether

the *threat* of continuity is demonstrated [citations omitted].

*H.J. Inc.*, 109 S.Ct. at 2902 (emphasis in original).

The key to the Court's interpretation of continuity is Congress' intent that RICO "reach activities that amount to or threaten long-term criminal activity". *H.J. Inc.*, 109 S.Ct. at 2902, n. 4. The establishment of the continuity aspect of pattern depends upon the facts and circumstances of each particular case. *Id.* at 2902. The Court discussed two non-exhaustive scenarios. The requisite threat of continuity may be established where, although the number of related predicates were small and occurred over a short period of time, the predicate acts themselves include an implied or explicit threat of repetition. *Id.* The Court used the example of a hoodlum who collected protection money from local shopkeepers while adding that he intended to return monthly. *Id.* Additionally, the threat of continuity may be established where the related predicate acts are shown to be part of an entity's (illegal or legitimate) regular way of doing business. *Id.*

In *H.J. Inc.*, the plaintiffs alleged that over the course of six years, non-commissioner defendants gave numerous bribes to certain utility commissioners with the objective of causing the commissioners to approve unfair and unreasonable rates for Northwestern Bell. The predicate acts (bribery) were alleged to be related by a common purpose of influencing favorable rate decisions. The fact the acts allegedly occurred frequently over a period of six years may be sufficient of itself to establish that the predicate acts amounted to

---

**1.** The Court cast doubt upon the use of the term "scheme" stating that it was in the "eye of the beholder" and "depended upon the level of generality at which the criminal activity was viewed". 109 S.Ct. at 2901, n. 3. In spite of this admonition, the Court repeatedly uses the term "scheme" throughout its opinion. Although the Court found no support in the language of RICO for use of the term "scheme", it seems natural in discussing "continuity" among predicate acts where predicate acts include mail and wire fraud, 18 USC §§ 1341 and 1343, and these offenses contain as elements, a "scheme" to defraud. *See* 18 USC § 1961(1)(b) (includes mail and wire fraud as racketeering activities). The

Seventh Circuit has noted this admonition, *see Management Computer Services v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 51 (7th Cir. 1989), however, the term "scheme" is still used in analyzing "pattern", in the Seventh Circuit's RICO opinions. *See Id.; Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986) (including in factors relevant to assessing continuity of racketeering activity, the presence or absence of separate schemes); *Sutherland v. O'Malley*, 882 F.2d 1196, 1204 (7th Cir.1989); *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1478 (7th Cir.1990) (recognized *Morgan v. Bank of Waukegan* as well established precedent of Seventh Circuit).

continuing racketeering activity. *H.J. Inc.,* 109 S.Ct. at 2906. Additionally, a threat of continuity of racketeering activity might be established by showing that bribes were a regular way of conducting Northwestern Bell's ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise. *Id.* It is important to note that while the Court emphasized a "threat" of continued racketeering activity, predicate acts which themselves "amount to continued racketeering activity" also satisfies the continuity requirements of a pattern. *Id.* at 2899, 2901, 2902 n. 4, 2906.

The Seventh Circuit first addressed the *Sedima* "continuity plus relationship" definition of pattern in *Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986). The factors relevant in a determination of whether continuity for purposes of a RICO pattern has been established include: (1) the number and variety of predicate acts and the length of time over which they are committed; (2) the number of victims; (3) the presence or absence of separate schemes; and (4) the occurrence of distinct injuries. 804 F.2d at 976; *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1478 (7th Cir.1990). Consistent with *H.J. Inc.,* the court in *Morgan* stated that the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean the acts automatically fail to satisfy the pattern requirement; no one factor is determinative and each case must be determined upon its own particular facts. 804 F.2d at 975, 976. Since *H.J. Inc.* was decided, the Seventh Circuit has held that its *Morgan* decision is still applicable and controlling precedent in this Circuit in light of *H.J. Inc.,* except possibly to the extent the court in *Morgan* focused on "schemes".[2] *Management Computer Services v. Hawkins, ASH, Baptie & Co.,* 883 F.2d 48, 50–51; *New Burnham Prairie Homes,* 910 F.2d 1474, 1478.

In *Morgan,* the court favorably referred to other pre-*Sedima* cases from the Seventh Circuit and found them consistent with the court's analysis of continuity factors in *Morgan.* 804 F.2d at 976; *see Illinois Department of Revenue v. Phillips,* 771 F.2d 312 (7th Cir.1985); *Lipin Enterprises v. Lee,* 803 F.2d 322 (7th Cir. 1986). In *Phillips,* allegations that the defendant mailed nine separate fraudulent tax returns to the State over a nine-month period were sufficient to establish a pattern of racketeering activity. *Morgan,* 804 F.2d at 976. Each mailing was a distinct transaction and these transactions occurred over a period of time. Each tax return was a separate lie and resulted in a separate underpayment, independent of other lies and underpayments. *Id.* In contrast to *Phillips,* the allegations in *Lipin* that defendant defrauded plaintiff as part of a single acquisition of $960,000 worth of stock, although involving multiple predicate acts of mail fraud, only involved a single transaction and were insufficient to allege a pattern of racketeering activity. *Id.* at 976, 977. The multiple predicate acts existed only because of the complex nature of the stock acquisition transaction which required many separate statements among various people. *Id.* All the predicate acts related to a single transaction, involved a single scheme directed at a single victim and resulted in a single injury. *Id.*

In *Morgan,* the plaintiffs alleged that defendants used the U.S. mails in the course of defrauding the plaintiffs in an initial loan transaction which occurred when the plaintiffs were induced into investing in the defendants' joint venture. Plaintiffs also alleged that the defendants used the U.S. mails in defrauding the plaintiffs as to two separate foreclosure sales of the joint venture's assets which resulted in the plaintiffs' losing their money and their home which the defendants had induced the plaintiffs to put up as collateral. The court in *Morgan* held these acts of mail fraud as alleged were distinct; some related to two separate foreclosure sales that occurred two years apart, while others related to the initial loan transaction. 804 F.2d at 976. These distinct acts which occurred over a four-year period were sufficiently alleged

2. See footnote 1.

to meet both the continuity and relationship aspects of a pattern of racketeering activity. *Id.; New Burnham Prairie Homes,* 910 F.2d at 1478–79.

### Sufficiency of Pattern Allegations

In the instant case, defendants argue that paragraph 33 of plaintiff's complaint is insufficient because it alleges a pattern of racketeering activity in the "most conclusory manner". Paragraph 33 of the complaint states:

> [t]he Dittons engaged in at least three separate schemes to injure P & P, all of which continued throughout 1987, 1988, and most of 1989. The acts undertaken by IT in furtherance of the Dittons' schemes were related in that each scheme had similar participants (the Dittons, and various employees of IT), victims (P & P), and methods of commission (wire fraud, mail fraud and extortion). The Dittons caused IT and Strata to commit wire fraud, mail fraud and extortion as a regular way of transacting business which, because IT still retains parts and proprietary information relating to both the Grudge Match Kit and ESAC card system, threatens to continue into the future.

The defendants' argument is at least partly disingenuous in that it ignores the plaintiff's attempts to allege in detail the three transactions or schemes involving the Capcom Bowling Kits, Grudge Match Kits and ESAC system as well as the various predicate acts related to each of these transactions. It is clear that plaintiff attempted in good faith to set out a complicated set of events in its complaint from which plaintiff's allegations in paragraph 33 would be understandable in light of the relevant law concerning a pattern of racketeering activity. Paragraph 33 is properly read in the context of the preceding thirty-two paragraphs which set out the relationship of the parties, the transactions, the conduct of the parties as to these transactions, and the predicate acts alleged to have occurred relative to each of these transactions. In this light, paragraph 33 is not a mere conclusory allegation. It is defendants who argue in a conclusory fashion that plaintiff's allegations fail to establish both the relationship and continuity prongs of the pattern of racketeering activity requirement.

Whether the allegations of paragraph 33, read in light of the factual allegations which support paragraph 33 are sufficient to allege a pattern of racketeering activity is to be determined with regard to this court's earlier conclusions concerning the insufficiency of plaintiff's allegations as to certain predicate acts. Additionally, as discussed earlier, plaintiff failed to allege that Strata was a RICO enterprise and, therefore, the Dittons' use of Strata, or their conduct of Strata's activities, cannot be looked at for purposes of determining the sufficiency of the pattern allegation. Finally, paragraph 33 refers to extortion as one of the predicate acts for which the Dittons allegedly used Strata. Besides not alleging Strata to be a RICO enterprise, there are no allegations in the earlier parts of plaintiff's complaint which support the inclusion of extortion relative to Strata in paragraph 33 of the complaint.

It is clear from the allegations that possibly hundreds of separate acts of mail fraud occurred in the course of the alleged scheme to defraud plaintiff relative to the Capcom Bowling Kit parts charges. Although plaintiff's allegations concerning the predicate acts of mail and wire fraud relative to Grudge Match were not pled with sufficient particularity, plaintiff did adequately allege the predicate act of extortion relative to the Grudge Match scheme. Finally, plaintiff has sufficiently alleged numerous acts of mail and wire fraud relative to the alleged ESAC system's scheme. These predicate acts meet the relationship requirement as defined in *H.J. Inc.* because they had similar purposes, results, participants, victims, or methods of commission and were not just isolated events. 109 S.Ct. at 2901. The predicate acts of mail and wire fraud concerning Capcom are related to each other because they are part of the same scheme to defraud plaintiff. Similarly, the numerous acts of mail and wire fraud concerning the ESAC system are related to defendants alleged scheme to defraud plaintiff in that

transaction. Further, all the predicate acts could be found to be related in that they involved the same participants and victim and do not appear to be merely isolated events.

Applying the factors listed in *Morgan* to the facts of this case, the court finds plaintiff's allegations sufficient to meet the continuity element of the pattern requirement. *See* 804 F.2d at 976. Defendants allegedly committed numerous predicate acts over a period of two-to-three years; although there is only one victim, P & P, three separate schemes are involved; and distinct injuries occurred, i.e., numerous overpayments relative to Capcom Kits, extortion of Grudge Match rights, and loss of money and proprietary information concerning the ESAC system. These alleged facts are sufficient, if true, to establish that either the predicate acts amounted to continuing racketeering activity or threatened continued racketeering activity. *See H.J. Inc.*, 109 S.Ct. 2893, 2906. Further, these facts could support a finding that these acts of racketeering activity constituted the Dittons' regular way of conducting IT's business. *Id.* Plaintiff has adequately alleged facts in support of a "pattern of racketeering injury".

The pattern facts as alleged in the instant case exceed the facts of similar cases in which the Seventh Circuit found a pattern to have been established. In *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir.1987), the defendant, who leased compressed air cylinders from the plaintiff, submitted numerous false invoices to the plaintiff through the U.S. mails over a seven-month period. Each false invoice deprived the plaintiff of its right to the rent or replacement value of the cylinders and resulted in a distinct injury to the plaintiff. *Id.* at 1305. This repeated infliction of separate and distinct economic injuries to the plaintiff arising out of repeated predicate acts of mail and wire fraud was held sufficient to establish a pattern of racketeering activity. *Id.* at 1304–1305. Similarly, as previously discussed, in *Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir.1985), the mailing of nine separate fraudulent tax returns to the plaintiff over a nine-month period was sufficient to establish a pattern of racketeering injury. Each mailing represented a separate and distinct transaction and resulted in a separate and distinct injury to the plaintiff, i.e., underpayment of taxes. *See Morgan*, 804 F.2d at 976 (discusses *Phillips* in relation to factors listed in *Morgan*). Unlike *Phillips* and *Liquid Air*, plaintiff, P & P has alleged three separate and distinct schemes. The Capcom Bowling Kit scheme alone, which like *Phillips* and *Liquid Air*, involved numerous transactions, i.e., numerous invoices for parts, would be sufficient to establish a pattern of racketeering activity based upon the Seventh Circuit's holdings in *Phillips* and *Liquid Air*. Clearly, plaintiff has sufficiently pleaded facts to support the pattern of racketeering activity requirement for a civil RICO claim.

### (IV) *Colorado River Doctrine*

Defendants request this court to exercise it discretion under, *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and abstain from proceeding with this federal action pending resolution of a parallel state-court proceeding.

The dispute between the Dittons and P & P over the Capcom Bowling Kits, Grudge Match and the ESAC debit card system are also the subject of a state-court action. On January 11, 1990, the Dittons' company, IT, filed complaint No. 90 CH 327 in the Circuit Court of Cook County, Illinois ("state-court action") against P & P, Edward Pelligrini (individually and doing business as Yankee Game Technology), Atlas Distributing, Inc. and Joseph Kaminkov. In the state-court action, IT alleges that a joint venture partnership agreement exists between IT, P & P and Joseph Kaminkov relative to the development, marketing and distribution of the Capcom Bowling Kits and Grudge Match. This agreement is the same one at issue in the federal action in this court. IT seeks a declaratory judgment that P & P and Pelligrini are required to pay to IT, $140 per PCB used in the Capcom Kits, an accounting of the activities and proceeds of the partnership, dissolution of the partner-

ship and injunctive relief. IT also claims that P & P and Pellegrini breached a fiduciary duty to the partnership. No affirmative relief is sought against Joseph Kaminkov. He is named only as a necessary party in light of his 20% interest in the joint venture partnership.

On February 7, 1990, P & P filed in the state-court action its counterclaim against IT, and a third-party complaint against Strata. P & P's claims against IT and Strata arise out of the same three agreements or transactions at issue in P & P's federal suit against the Dittons, i.e., the Capcom Bowling Kits, Grudge Match and the ESAC debit card system. P & P's state-court claims against IT based upon the Capcom joint venture agreement are: (1) fraud in overcharging P & P for PCB's and other parts unnecessary or unrelated to the Capcom Bowling Kits; (2) breach of contract; (3) breach of fiduciary relationship; (4) unfair competition and injunctive relief relative to the Dittons' and Strata's development of a competing bowling game; and (5) an accounting of the invoices and parts purchased by IT for the Capcom Bowling Kits. P & P's claim against IT over Grudge Match is also nearly identical to its federal claim against the Dittons except it is for breach of contract and an accounting. Similarly, P & P's state-court claim relative to ESAC is for breach of contract and an accounting and injunctive relief. The actual monetary damages P & P seeks to recover relative to all three agreements are nearly identical to the actual damages that it seeks to recover in its federal action. P & P's third-party complaint against Strata is for unfair competition and injunctive relief and alleges Strata conspired with IT to get IT to breach the joint venture agreement with P & P which would have required prior approval for development of a competing bowling game by IT.

The "exceptional-circumstances test" established by the Supreme Court in [Colorado River] permits a district court to dismiss or stay an action when there is an ongoing parallel action in state court. As the Court explained in *Colorado River*, the principles underlying this doctrine "rest on considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation'" [citations omitted]. Because federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them," the mere fact that an action is pending in state court ordinarily is no bar to parallel federal proceedings [citations omitted]. Thus, the surrender of jurisdiction in deference to parallel state proceedings for reasons of "wise judicial administration" is warranted only under "limited" and "exceptional" circumstances [citation omitted]. As we explained in *Lumen Construction, Inc. v. Brant Construction Co.*, 780 F.2d 691, 694 (7th Cir.1985), "a federal court cannot lightly abjure its responsibility to assert jurisdiction." Moreover, the Supreme Court has emphasized that "[o]nly the clearest of justifications" will allow a federal court to surrender jurisdiction because of parallel state-court litigation. [citations omitted.]

*LaDuke v. Burlington Northern Railroad Co.*, 879 F.2d 1556, 1558 (7th Cir.1989).

Before a district court may exercise its discretion under the *Colorado River* doctrine, it must first determine whether the concurrent state and federal actions are actually parallel. *LaDuke*, 879 F.2d at 1559. Suits are "'parallel' when substantially the same parties are contemporaneously litigating substantially the same issues in another forum". *Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.*, 600 F.2d 1228, 129 n. 1 (7th Cir.1979). Complete identity of parties and issues between the two actions is not required. *Lumen Construction, Inc. v. Brant Construction Co., Inc.*, 780 F.2d 691, 696 (7th Cir.1985); *Day v. Union Mines Inc.*, 862 F.2d 652, 656 (7th Cir. 1988). The court does not look for "'[f]ormal symmetry between the two actions but for a substantial likelihood that the state litigation will dispose of all the claims presented in the federal case.'" *Id.* at 656 (quoting *Lumen Construction*, 780 F.2d at 695). This is to be determined based upon

the status of the state proceeding at the time the stay is requested. *Id.*

In the instant case, the only significant difference between parties is that the Dittons are not named parties in the state action counterclaim, and IT is not a party in the federal action. However, the Dittons control IT and the only real difference between P & P's federal action and state action is that P & P alleges that the Dittons "caused" IT to commit the fraud and breach of agreements complained of in its state-court counterclaim against IT. Clearly, substantially the same issues are involved in the state-court action. All three of the same agreements or transactions are at issue. The state-court action will necessarily involve the application of Illinois contract and partnership law to the disputes between IT, P & P, the Dittons and Edward Pellegrini. P & P's federal action, involving these same agreements, would also require this court to resolve substantially the same issues involving the interpretation and enforcement of these agreements under Illinois law. The court finds a substantial likelihood that the state-court action will dispose of all the claims presented in the federal case. This is especially true where P & P's civil RICO claim could have been brought as part of its state-court counterclaim and *res judicata* or collateral estoppel would likely operate to bar such a claim after resolution of the state-court proceedings. *See Tafflin v. Levitt*, —— U.S. ——, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (state courts have concurrent jurisdiction over civil RICO claims). Thus, the prerequisite to the application of the *Colorado River* doctrine is satisfied in this case.

Having determined that the state and federal actions are parallel, there are at least ten factors a court should consider in exercising its discretion to determine whether "exceptional circumstances" exist that would justify deference to the state courts under the *Colorado River* doctrine. *LaDuke*, 879 F.2d 1556, 1559. These ten factors are: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was ob-

tained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim.

No single factor is necessarily determinative and the weight to be given any one factor depends on the particular circumstances of each case. *Id.* These factors are "to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand". *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 25, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983). "[T]he district court must reach a carefully considered judgment[,] taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise." *LaDuke*, 879 F.2d at 1559 (quoting *Colorado River*, 424 U.S. at 818–819, 96 S.Ct. at 1247).

In the instant case, jurisdiction was first obtained by the Circuit Court of Cook County, Illinois which has already issued and dissolved a temporary restraining order, denied a motion to strike and dismiss the complaint and directed P & P and Edward Pellegrini to set up an escrow account for receipt of the profits from the Capcom Bowling Kit sales. Discovery has also begun with the state-court proceeding. Inconvenience of the federal forum is a nonfactor in this case as the courts are only a few blocks from each other. As can readily be seen from the almost identical nature of the state and federal actions which involve the same three transactions and relationships between the same people or entities, a decision to stay the federal proceeding would definitely avoid piecemeal litigation and the attendant risks of duplicative efforts with possibly conflicting results. *See Day v. Union Mines, Inc.*, 862 F.2d 652, 659 (7th Cir.1988). This is especially true where the validity, interpretation and enforcement of the agreements as well as the nature of the relationships between the

parties (partnerships) are controlled by Illinois law. While federal law would control P & P's RICO claim, P & P's fraud claim in the federal action, and all of its claims in the state actions are controlled by Illinois law concerning contracts, partnerships and common law fraud. The fact that the state courts have concurrent jurisdiction of civil RICO claims, *see Tafflin*, 110 S.Ct. 792, further bolsters the adequacy of the state-court action to protect P & P's federal rights. Removal to federal court is not available as the state action currently stands. *See* 28 USC § 1441. As to the last factor listed, the court hesitates to make any finding that P & P's federal action is contrived or vexatious. The Supreme Court holding in *Tafflin* was issued after the state-court action was filed by IT and only two weeks prior to P & P's counter-claim and one month prior to P & P's federal action in this court. However, this does not change the fact that P & P's federal claim may now be asserted as part of its counterclaim in the state-court action and failure to assert such a claim might later preclude P & P from litigating such issues in the future under the doctrines of *res judicata* or collateral estoppel.

The court is aware of the exceptional circumstances required before a court may exercise its discretion under *Colorado River* to abstain in exercising federal jurisdiction, but the instant case is such a situation. The factors discussed weigh heavily in favor of deference to the state-court action. P & P's claims against the Dittons in the federal action and the Dittons' corporation, IT, in the state action, are essentially disputes over relationships and agreements governed by Illinois law. In light of the factors discussed and the near identical factual basis of P & P's state and federal claims along with the fact P & P may litigate its federal civil RICO claim in state court, this court finds that the state-court action "will be an adequate vehicle for the complete and prompt resolution of the issue[s] between the parties". *Moses H. Cone Hospital*, 460 U.S. at 28, 103 S.Ct. at 943. Accordingly, the court grants defendants', the Dittons, motion to stay this proceeding pending resolution of the state-

court action. *See LaDuke*, 879 F.2d at 1561, 1562 (stay not dismissal is appropriate action when deferring to a parallel state-court proceeding under the *Colorado River* doctrine).

ORDERED: Defendants', the Dittons, motion to dismiss for failure to state a claim is denied. Defendants' alternative motion for a stay pending resolution of a parallel state-court action is granted.

This case is hereby stayed pending resolution of Case No. 90 CH 327 currently pending in the Circuit Court of Cook County, Illinois.